[S. F. No. 6499.    In Bank.—December 20, 1913.]

## PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Petitioner, v. JOHN E. ESHLEMAN, H. D. LOVELAND, ALEX GORDON, MAX THELEN, and EDWIN O. EDGERTON, as Members of and constituting the Railroad Commission of the State of California, Respondents.

RAILROAD COMMISSION — BOTH A COURT AND AN ADMINISTRATIVE TRIBUNAL—CONSTITUTIONAL AMENDMENT OF 1911.—Sections 22 and 23 of article XII of the state constitution, as amended on October 10, 1911, have, in the state railroad commission, created both a court and an administrative tribunal, and in the performance of its most important duties imposed on it by sections 53 to 81 of the Public Utilities Act (Stats. Ex. Sess. 1911, p. 18), the commission must sit as a tribunal exercising judicial functions of great moment. (Per Henshaw, J., Lorigan, J., and Melvin, J., concurring.)

ID.—PUBLIC UTILITIES ACT—REVIEW OF ORDERS OF RAILROAD COMMISSION BY SUPREME COURT ON CERTIORARI—ENLARGEMENT OF SCOPE OF WRIT.—Section 67 of the Public Utilities Act, providing for a writ of *certiorari* exclusively before the supreme court for the purpose of reviewing an order or decision of the railroad commission, and authorizing its review to determine whether the commission has regularly pursued its authority "including a determination of

whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of California," has enlarged the scope of such writ beyond all former constitutional or statutory definitions, and all previous rulings and decisions in this state limiting its scope.   (Idem.)

ID.—CONSTRUCTION OF CONSTITUTION—CONTROLLING EFFECT OF LANGUAGE.—The supreme court in construing such constitutional enactment is limited to the language of the enactment itself and its construction may not be governed by what the framers of the amendments meant to say.   (Idem.)

ID.—CONSTITUTIONAL LAW—CONTROL OF PUBLIC UTILITIES BY COMMISSION—UNRESTRICTED RIGHT OF LEGISLATURE TO CONFER POWERS ON COMMISSION—COURTS CANNOT QUESTION POWERS OF COMMISSION UNDER STATE CONSTITUTION.—The state constitution, by such amendments of sections 22 and 23 of article XII, has created a commission having control of the public utilities of the state, and has authorized the legislature to confer such additional and different powers upon the commission touching public utilities as it may see fit, unrestrained by other constitutional provisions.   The legality of such powers as the legislature has or may thus confer upon the commission, if cognate and germane to the subject of public utilities, may not be questioned under the state constitution.   It follows, that the provisions of section 67 of the Public Utilities Act, depriving all state courts except the supreme court of jurisdiction to review the orders and decisions of the commission, and enlarging the jurisdiction of the supreme court in its review on *certiorari* of such orders and decisions, cannot be questioned under the state constitution.   (Idem.)

ID.—EXTENT OF POWERS OF SUPREME COURT TO REVIEW ORDERS OF COMMISSION—PROTECTION GUARANTEED BY FEDERAL CONSTITUTION AWARDED ON CERTIORARI.—Such constitutional provisions are binding upon the supreme court, and under them it becomes the duty of that court to lend its aid in giving effect to every power and prerogative with which the legislature may vest or clothe the railroad commission, subject to the limitations imposed on the exercise of its power by the controlling provisions of the constitution of the United States.   If, therefore, on the proceeding in *certiorari*, it shall appear that the exercise by the commission of the powers conferred upon it by the legislature has violated the petitioner's rights under the constitution of the United States, protection under that constitution will be awarded him.   (Idem.)

ID.—REASONABLENESS OF ORDERS OF FEDERAL COGNIZANCE ONLY—EFFECT OF ORDERS—FINDINGS OF COMMISSIONERS.—The reasonableness of the railroad commissioner's orders and decrees, under the Public Utilities Act, may not be inquired into by any court of this

state, and consequently is of federal cognizance only. But while the reasonableness of such orders may not be questioned, resort may be had to the findings of the commission to aid in determining the meaning and effect of its orders. (Idem.)

Id.—Police Power—Regulation of Public Utilities—Principles Governing Exercise—Power of Eminent Domain.—In the exercise of the police power in the regulation of public utilities, while each case which is rested upon the exercise of that power must be subject to its own individual consideration, certain fundamental principles govern all. The first of these is that this power goes merely to the *regulation* of the public utility, and that when an order passes beyond proper regulation it amounts to a taking of the property and the order is then referable not to the police power but to the power of eminent domain. The second is that this regulatory power falls into three natural subdivisions: 1. The right to regulate tolls and charges, to the end that fair compensation may be returned and excessive charges be forbidden; 2. The right to prevent discrimination upon the part of the public utility directed against those who employ it, or make use of its agencies, or the commodity which it furnishes; 3. The right to make orders and to formulate rules governing the conduct of the public utility, to the end that its efficiency may be built up and maintained and the public be accorded desirable safeguards and conveniences. Beyond these matters regulation, as regulation, does not go, and it is immaterial that the law or order be in terms and in form regulatory, if, in effect, it is a taking of property or a deprivation of the use of property within the meaning of the constitution. No public convenience or necessity, however urgent, will justify such a taking without compensation under the guise of the police power. (Idem.)

Id.—Taking of Property—Deprivation of Its Use by Owner.—A "taking" of property within the meaning of the constitutional guaranty, is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of its use. (Idem.)

Id.—Property Devoted to Particular Public Use—Subjection by Legislature to Another Public Use—Exercise of Power of Eminent Domain—Compensation Essential.—The subjection by the legislature, acting directly or through its authorized mandatories, of property devoted by its owners to a public use to another public use, or to the same public use by its rivals, is an act referable to the power of eminent domain and not to the police power, and compensation must be made accordingly. (Idem.)

Id.—Devotion to Public Use Does Not Destroy Ownership—Management Cannot be Taken Away Under Police Power.—The devotion to a public use by a person or corporation of property held by them in ownership does not destroy their ownership and does

not vest title to the property in the public so as to justify, under the exercise of the police power, the taking away of the management and control of the property from its owners without compensation, upon the ground that public convenience would better be served thereby, or that the owners themselves have proven false or derelict in the performance of their public duty. A law or order seeking so to do is in excess of the police power. (Idem.)

ID.—RAILROAD COMMISSION MAY EXERCISE POWER OF EMINENT DOMAIN—JURY TRIAL NOT ESSENTIAL—EQUAL PROTECTION OF LAWS.—The right to exercise the power of eminent domain in matters involving public utilities has been vested by the legislature in the railroad commission by the Public Utilities Act. The exercise of this power and the making of awards thereunder with respect to public utilities, without the intervention and verdict of a jury as required in other cases, are not in violation of the constitution of this state, nor of the provision of the constitution of the United States guaranteeing the equal protection of the laws. (Idem.)

ID.—RAILROAD COMMISSION MUST MAKE COMPENSATION AND DECREE PAYMENT PRIOR TO TAKING.—While the compensatory award in such cases rests with the railroad commission, it is still the duty of the commission, under section 14 of article I of the state constitution, as well as under the provisions of the Public Utilities Act itself, in the exercise of its powers of eminent domain, to make compensation for the taking of the property of a public utility, and to decree payment thereof in advance of the actual taking. (Idem.)

ID.—LONG DISTANCE TELEPHONE COMPANY—ORDER REQUIRING PHYSICAL CONNECTION WITH LINES OF LOCAL COMPETING COMPANY—EXERCISE OF POWER OF EMINENT DOMAIN—ORDER NOT REGULATORY OR ADMINISTRATIVE.—An order of the railroad commission directed to a telephone company which for many years had maintained a long distance service throughout the state of California, and in connection therewith had maintained a local exchange service in certain counties, but which had never dedicated its property to the use of rival and competing companies, compelling it to permit a connection between its long distance lines and the local lines of rival and competing companies operating locally in such counties, under which, by the use of its switchboards, operators, and lines, its property and its agencies, such rival and competing companies and their subscribers should have the same rights to all its long distance instrumentalities as its own subscribers and patrons, involves the exercise of the power of eminent domain and not of the police power, and is not merely regulatory nor administrative. (Idem.)

ID.—EXTENT OF POLICE POWER—REGULATION OF USE WITHIN DEDICATED USE—INVALIDITY OF ORDER.—In dealing with public utilities, regula-

tion of use within the dedicated use is as far as the police power may be extended, and when the regulation exceeds this, it is always void for unreasonableness and may, depending upon the form and character of the order, be also void as an attempt to take property without compensation in violation of the constitutional protection. (Idem.)

Id.—Order a Taking of Property Without Compensation—Order Void Under State and Federal Constitution—Annulment on Certiorari.—Such order of the railroad commission, by subjecting the property of the telephone company conducting the long distance service to a new use, is tantamount to a taking of its property without compensation, within the meaning of the prohibitive constitutional provisions, and is therefore void by force and virtue of the constitutions of the state and of the United States, and will be annulled on certiorari by the supreme court. The fact that its property is turned over to the use of a competing company, to the manifest and proved injury to its local business, is an added element of injury in the taking and a proper matter for compensation. (Idem.)

Id.—Apportionment of Rates for Future Service not Compensation for Taking.—An apportionment of rates and tolls between the companies affected by the order for a service to be rendered in the future is not a compensation for the present taking of the property, nor can the allocation of such rates and tolls to be earned in the future ever measure up to the constitutional requirement that property shall not be taken without compensation first made and paid to the owner. (Idem.)

Id.—Review of Orders of Commission by Courts—Power Limited to Supreme Court.—The supreme court has no power to review the orders of the railroad commission except by means of a writ of *certiorari,* or to control its action except in appropriate cases by *mandamus.* No other court of the state has any power to review the orders of the commission or to control its official action. (Per Sloss, J., and Shaw, J., concurring.)

Id.—Review Limited to Questions of Jurisdiction.—Upon a writ of *certiorari* against the railroad commission the supreme court must inquire whether the commission has acted within its jurisdiction, and if this inquiry be answered affirmatively the proceeding must be dismissed. (Idem.)

Id.—Order of Commission cannot be Questioned Under State Constitution—Powers Conferred on Commission must Concern Regulation and Control of Public Utilities.—If the railroad commission has acted in conformity with the powers granted to it by the legislature, the validity of its order cannot be questioned in the supreme court or elsewhere under a claim of violation of

any provision of the state constitution other than the provisions relating to the railroad commission. This statement is, however, to be taken subject to the qualification that the powers conferred by the legislature on the railroad commission must be such as are cognate and germane to the purposes for which the railroad commission was created, i. e., the regulation and control of public utilities. (Idem.)

ID.—ACTS OF COMMISSION AS AFFECTED BY GUARANTIES OF FEDERAL CONSTITUTION—VIOLATION OF GUARANTIES—RECOURSE MUST BE HAD TO FEDERAL COURTS.—Where the commission has acted within the powers conferred upon it by the legislature, the only recourse of one affected by its action is to the guaranties of the federal constitution. And in cases where the violation of the right guaranteed by the federal constitution does not involve an excess of the jurisdiction of the railroad commission, the federal courts are the only ones in which he may assert his rights under those guaranties. (Idem.)

ID.—ORDER WITHIN POWERS OF COMMISSION—TAKING OF PRIVATE PROPERTY FOR PUBLIC USE WITHOUT COMPENSATION—STATE CONSTITUTION NOT VIOLATED.—If the railroad commission, acting within the powers granted to it by the legislature, makes an order which amounts to a taking of private property for public use without compensation, such order does not violate any provision of the constitution of this state. (Idem.)

ID.—SUCH ORDER VIOLATES FOURTEENTH AMENDMENT OF FEDERAL CONSTITUTION.—If in making such order private property is taken for public use without compensation, such taking is a violation of the provisions of the fourteenth amendment to the constitution of the United States. (Idem.)

ID.—PUBLIC UTILITIES ACT—PROVISION AUTHORIZING SUCH ORDER IS VOID—COMMISSION WITHOUT JURISDICTION TO MAKE ORDER.—Any provision of the Public Utilities Act is void to the extent that it purports to grant to the railroad commission power to take private property without compensation, and the act confers no jurisdiction on the board to make an order having this effect. (Idem.)

ID.—DIRECTING PHYSICAL CONNECTION BETWEEN TELEPHONE COMPANIES—VOID PROVISION OF PUBLIC UTILITIES ACT—TAKING OF PROPERTY WITHOUT COMPENSATION.—Section 40 of the Public Utilities Act, authorizing the ordering of physical connection between telephone companies, is void in so far, at least, as it purports to require a company having long distance and local service, to make a physical connection for long distance service with a company competing locally, where the first company has not professed to render this kind of service. An order for physical connection is, in such a case, a taking of the property of the complaining company without compensation. (Idem.)

ID.—ORDER IN EXCESS OF JURISDICTION OF COMMISSION—ANNULMENT.—
The order of the railroad commission under review, which pur-
ports to direct such a connection, was in excess of the jurisdiction
of the commission and should be annulled. (Idem.)

APPLICATION for a Writ of Review directed to the
members of the Railroad Commission of the State of Cali-
fornia.

The facts are stated in the opinion of the court.

H. D. Pillsbury, Hunt Chipley, and Pillsbury, Madison &
Sutro, for Petitioner.

Ralph C. Harrison, *Amicus Curiae,* also for Petitioner.

Max Thelen, and H. P. Andrews, *Amicus Curiae,* for Re-
spondents.

HENSHAW, J.—The Tehama County Telephone Company
and the Glenn County Telephone Company lodged with the
railroad commission separate petitions or complaints, seek-
ing orders of the railroad commission compelling the Pacific
Telephone and Telegraph Company to permit a physical con-
nection or physical connections to be made between its tele-
phone lines and the lines of the complaining companies. The
proceedings were consolidated, and, after hearing, the rail-
road commission made certain findings upon which was based
its order in accordance with the prayers of the petitioners.
The Tehama County Telephone Company may be described
as a telephone company doing a local business in the county of
Tehama. In like manner the Glenn County Telephone Com-
pany is engaged in the same business in the county of Glenn.
The Pacific Telephone and Telegraph Company does a similar
local business in each of those counties, and in addition
thereto conducts a long distance business, reaching into many
if not all of the counties of the state. The order of the rail-
road commission gives to the Tehama County Telephone Com-
pany and the Glenn County Telephone Company and their
subscribers the use of all the extended long distance service
maintained by the Pacific Telephone and Telegraph Com-
pany within the state of California, excepting therefrom an

interchange for use of the Pacific Company's lines between the two counties of Tehama and Glenn, the petitioning companies between themselves having established such communication.

In conformity with the provisions of section 67 of the Public Utilities Act, (Stats. Ex. Sess. 1911, p. 55), the Pacific Telephone and Telegraph Company made application to this court for a writ of review. Hon. Ralph C. Harrison, as *amicus curiae,* filed a brief presenting to the attention of this court constitutional questions touching not only its own jurisdiction in the matter, but as well the jurisdiction of the superior court. Those questions demand first consideration, not alone from their gravity, but because their determination, the one way or the other, will greatly limit or enlarge the scope of the inquiry now before us. The argument of the learned friend of the court may be thus epitomized: Article VI of the constitution of the state vests judicial power in certain designated tribunals, and apportions the exercise of the judicial power between and amongst them. Section 4 of this article gives to the supreme court certain appellate jurisdiction and original jurisdiction to issue named writs, including the writ of certiorari or review. Section 5 of the same article confers upon the superior court original jurisdiction of great extent, in fact, and generally speaking, over all matters of consequence in law and at equity involving the enforcement of public or private rights or the redress of public or private wrongs. Next, so proceeds the argument, it is to be remembered that the jurisdiction thus conferred upon these judicial tribunals is not subject to legislative control, that is to say, that jurisdiction cannot be either enlarged or curtailed. "It is a well recognized principle that where the judicial power of courts, either original or appellate, is fixed by constitutional provisions, the legislature cannot either limit or extend that jurisdiction." (*Chinn* v. *Superior Court,* 156 Cal. 478, [105 Pac. 580]; *Marbury* v. Madison, 1 Cranch, 137, [2 L. Ed. 60].) It is then pointed out that at the time of the adoption of the present constitution the writ of *certiorari* had a limited and well understood scope, defined by sections 1068 and 1074 of the Code of Civil Procedure, and illustrated and expounded in conformity with these sections by many decisions of this court. The

availability of its employment and the limitations of its scope may be thus summarized: 1. It is a writ issued by a superior judicial tribunal to an inferior officer or tribunal exercising judicial functions, and the proceeding sought to be brought up for review must in its nature be a judicial proceeding; 2. To justify its issuance by a superior tribunal it must appear that the applicant for it has no other plain, speedy, and adequate remedy; 3. When issued, the superior tribunal reviews the action of the inferior officer or tribunal only to the extent of determining whether the inferior board or tribunal has exceeded its jurisdiction. (*People* v. *Bush,* 40 Cal. 346; *Quinchard* v. *Board of Supervis*c 113 Cal. 664, [45 Pac. 856] ; *Cook* v. *Civil Service Commiss*ı 160 Cal. 589, [117 Pac. 663].) Thus in *Central Pacific R.* ₁ *Co.* v. *Placer County,* 46 Cal. 671, it is said: ''A writ of *certiorari* is not the appropriate proceeding for the correction of mere errors of judgment, in respect either to the facts or the law of the case, in determining questions within the jurisdiction of the board.'' In *Sherer* v. *Superior Court,* 96 Cal. 654, [31 Pac. 565], it is said that '' it must be deemed to be the settled law of this state that the writ of *certiorari* brings up for review but one question, and that is, whether the inferior tribunal or court exceeded its jurisdiction.'' And in *Spring Valley Water Co.* v. *Bryant,* 52 Cal. 138, this court declared: ''The resolution and ordinance sought to be annulled may be obnoxious to the criticism that they were attempts to deprive the corporation of its rights and property without due process of law, and violative of constitutional principles; but neither this, nor the circumstance that they were not authorized by the city charter to pass them, can justify a review of the action of the board and mayor by *certiorari.*'' And, finally, the indisputable proposition is advanced that the legislature cannot enlarge the scope of any writ named in the constitution beyond that which it had at the time the constitution was adopted. (*Camron* v. *Kenfield,* 57 Cal. 550.)

Such being the law, it is argued that the conclusion is irresistible that the legislature's attempt to enlarge the purview of the writ of *certiorari* when in section 67 of the Public Utilities Act it declares that ''the review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination

of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of California,'' is null and void, and that the attempt of the legislature to confer upon the supreme court the power to include in its determination under the writ of review the question of the violation of constitutional rights is nugatory and in direct conflict with the principle of the decision of *Spring Valley Water Co.* v. *Bryant,* 52 Cal. 138. Next it is insisted that the attempt to confer exclusive jurisdiction upon the supreme court to review the proceedings of the railroad commission, to the impairment of the general jurisdiction of the superior court, is itself violative of the constitution, in that it is a plain legislative attempt to curtail the jurisdiction vested in the superior court by the constitution. The language of the legislative act in this regard is that, ''No court of this state (except the supreme court to the extent herein specified) shall have jurisdiction to reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties.'' (Public Utilities Act, sec. 67, (Stats. Ex. Sess.) 1911, p. 55.) Therefore, concludes the argument of the learned friend of the court, it is conceded that this court has the constitutional power to issue a writ of review. In the case at bar, admitting that the railroad commission in the matter in question was exercising judicial functions, this court's consideration is limited to the single proposition whether or not the commission has exceeded its jurisdiction, or, what is the same thing in other words, ''has regularly pursued its authority''; that this court will not, under the writ, undertake to determine whether constitutional rights have been violated or other errors have been committed, but must leave those questions to the superior court which, under the constitution, has authority to determine them under proper application to enjoin the enforcement of the order complained of, and that it is the manifest duty of this court so to hold and to declare.

A minor branch or corollary of the main argument upon these jurisdictional questions rests upon the proposition that in the matter here under review the railroad commission was not exercising judicial functions, but that its acts were purely

legislative or legislative-administrative. As the Public Utilities Act is here for the first time before this court, as the question is thus fairly within this case, and as to ignore it is but to necessitate its consideration in subsequent litigation, it is proper to say that we hold the powers and functions of the railroad commission in many instances, and in the present one, to be of a highly judicial nature. That judicial powers were with deliberation vested in the commission the language of the constitution and of the legislative enactments following the constitution leave no doubt. Thus the constitution itself declares: "The commission shall have the further power . . . to hear and determine complaints against railroad and other transportation companies; to issue subpoenas and all necessary process and send for persons and papers; and the commission and each of the commissioners shall have the power to administer oaths, take testimony and punish for contempt in the same manner and to the same extent as courts of record." (Sec. 22, art. XII.) While without quoting, a reading of sections 22 and 23 of article XII of the constitution and of sections 53 to 81 of the Public Utilities Act will establish beyond doubt that the railroad commission is empowered to sit, and in the performance of its most important duties must sit, as a tribunal exercising judicial functions of great moment. It may be said that the final order of the commission in many instances is legislative-administrative in character, but none the less the ordained procedure by which this result is to be reached, the determination of controverted facts between private litigants and disputants, and the decision upon these controverted matters, are strictly judicial. (*Robinson* v. *Sacramento,* 16 Cal. 208; *Imperial Water Co.* v. *Board of Supervisors,* 162 Cal. 14, [120 Pac. 780].)

The answer of the commission insists that *certiorari* is not only a proper remedy, but is the sole remedy provided by law. It points out that in other jurisdictions, as in New York (*Steward* v. *Railroad Commissioners,* 160 N. Y. 202, [54 N. E. 697]), the writ of *certiorari* has been employed "to correct errors of law affecting property rights." But these decisions, showing a broader use of the writ in other jurisdictions, can have no pertinency to the consideration of the laws of this state where the writ has never been used with

such latitude, and where its use, defined by our very statutes, is restricted to questions of jurisdiction alone. To the argument that section 67 of the Public Utilities Act in providing for a writ of *certiorari* before this court has unconstitutionally enlarged the scope of the writ by including within it "a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of California" respondent makes answer that this was not the legislative intent, for if the legislature had intended to add to the function of the writ of review it would have said "and also a determination" or "in addition thereto a determination" etc. But in consideration of the fact that the proceeding, and the only proceeding, as defined by the legislative enactment under which the action of the railroad commission can be considered at all, is under this writ of review, and as under the constitutional writ of review only the question of excess of jurisdiction can be considered, and as under the writ of review provided for by section 67 much more than this is to be considered, it is not a satisfying answer to say that the legislature did not mean to broaden its scope when by apt and precise language it actually has broadened its scope. As was said by this court in *Camron* v. *Kenfield,* 57 Cal. 554: "The new constitution was framed in view of the construction of the language used in the former constitution, unanimously concurred in by the members of the higher tribunals of the state. Yet the framers of the present constitution repeated the words embraced in the former. We are forced to the conclusion that they used these words in the sense which had been attributed to them by the supreme court." It matters not, therefore, that the legislature used the word "including" and might have used the words "and also" or "in addition thereto." The legal effect is necessarily the same in each instance, and that effect is to broaden beyond all former definitions, rulings, and decisions in this state the scope of the writ of review.

To the argument of the unconstitutionality of the act in curtailing the jurisdiction and powers of the superior court, which jurisdiction and powers themselves have their origin in the constitution, the sole answer made is that because this court has the power to issue a writ of review and in this case

has done so, the question here is a moot question and will be met when it properly arises. This response, too, fails of completeness in view of the fact, as above pointed out, that the proposition presented is one strictly within the case and that proposition is that, in the performance of its duties, it is compulsory on this court to declare what scope pertains to the writ of review which it has issued, and if it shall hold that its inquiry is limited to the question of jurisdiction alone, it must further declare whether or no the superior courts of the state are open to the redress of asserted wrongs which this court is incapable of correcting. In short it must declare whether the doors of the superior court are closed to petitioners of this class and whether the constitution and laws of this state leave an applicant for justice under such circumstances to the limited relief which this court may grant.

The questions thus presented are of great public moment and of equal private consequence. The answer to them should not be postponed or evaded. The demand is immediate and insistent for their careful consideration and complete solution. In this consideration the first established fact is that section 67 of the Public Utilities Act does, in violation of all precedent and decision, seek to enlarge the purview of the writ of review. If the legislature has done this without sanction of the constitution, it would result merely in compelling a declaration from this court that the legislative attempt was unwarranted, and that the writ of review must remain as defined at the time the constitution was adopted. The second fact, which cannot be blinked and must be faced, is that the legislature has with deliberation restricted and curtailed the jurisdiction vested in the superior courts of this state by the constitution. And upon this but one thing can be said. If there be not in the constitution itself warrant and power to the legislature to do this thing, its effort must be declared illegal. Our inquiry is thus immediately brought to the constitutional amendments upon the authority of which the Public Utilities Act was adopted.

Article XII of the constitution relating to corporations was upon October 10, 1911, amended by the people of the state in important particulars. A constitutional body known as the railroad commission was created. The appointment of

the members by the governor and their terms of office were provided for.

Upon this commission was conferred specified powers in the establishment of rates and charges for transportation companies. This was done by section 22 of article XII, which further declared as follows: "No provision of this constitution shall be construed as a limitation upon the authority of the legislature to confer upon the railroad commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the railroad commission in this constitution, and the authority of the legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this constitution." Section 23 of the same article defined "public utilities" and brought all such utilities under the control of the railroad commission. Section 23 then declared: "The railroad commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the state of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, and the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this constitution. . . . Nothing in this section shall be construed as a limitation upon any power conferred upon the railroad commission by any provision of this constitution now existing or adopted concurrently herewith."

Pursuant to this grant of power by the constitution to the legislature, the Public Utilities Act was passed and adopted. The act is altogether too long to be set forth *in extenso*, but summarized it provides for the organization of the commission, confers upon it large powers of control over all public utilities, prescribes heavy penalties in the way of fines upon public utilities violating the orders of the commission, and declares guilty of a misdemeanor the person who so violates or aids in violating an order with punishment fixed by a fine not exceeding one thousand dollars, by imprisonment not exceeding one year, or by both. Power to punish for contempt is likewise conferred, and the act contains a legislative declara-

tion as follows: "If any section, subsection, sentence, clause or phrase of this act is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this act. The legislature hereby declares that it would have passed this act, and each section, subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more other sections, subsections, sentences, clauses or phrases be declared unconstitutional."

Two constructions of the constitutional provisions above quoted have been presented to the consideration of the court. First, that the constitution itself has designedly conferred upon the legislature the fullest possible powers to legislate concerning public utilities through the board of railroad commissioners; that it was intended that upon the board of railroad commissioners should be conferred whatsoever powers the legislature saw fit, and that nothing in any other provisions of the constitution should hamper the legislature in so doing; that the board of railroad commissioners itself was especially exempted from the operation of the recall, to the end that it might exercise such powers as the legislature might confer upon it without possible embarrassment; that the railroad commission differs from all other officers of the state in that the legislature alone, and not the people, is authorized to unseat any of its members (Const. art. XII, sec. 22); that this constitutional meaning is precisely and aptly evidenced by section 22, when it declares that "No provision of this constitution shall be construed as a *limitation upon the authority of the legislature* to confer upon the railroad commission *additional powers* of the same kind *or different* from those conferred herein which are not inconsistent with the powers conferred"; that there is the fullest possible grant of authority, to confer all kinds of additional powers, with the sole limitation that whatever additional powers may be vested by the legislature in the commission shall not be inconsistent with the constitutional powers conferred; that this means and can only mean that the legislature may not curtail any of the powers vested by the constitution in the railroad commission, but that the legislative authority, to confer any kind of additional powers is, and is expressly declared to be, "plenary and unlimited by any provision of this constitution"; further, that the people in enacting these constitu-

tional amendments designedly and deliberately did this thing, to the end that the railroad commission thus constituted should have its labors unvexed and their results untrammeled by the courts of the state; that the legislature itself adopted this view of the Public Utilities Act, which was framed with much care and passed with due deliberation; that this is shown in many passages of the act itself, not alone in that which deprives the superior courts of their constitutional jurisdiction, but as well in that which deprives this court of a jurisdiction which otherwise it would have. For it has universally been held by all courts, and specifically by the supreme court of the United States in reviewing the orders of the interstate commerce commission—a kindred board to our railroad commission—that the question of discrimination and reasonableness is always subject to judicial review. (*Interstate Commerce Commission* v. *Northern Pac. R. R. Co.,* 222 U. S. 541, [56 L. Ed. 308, 32 Sup. Ct. Rep. 108].) Our Public Utilities Act in terms declares that the determination of the commission shall not be open to review upon the subject of ''reasonableness and discrimination.'' When the legislature vested in this court alone this limited power of review and included therein the duty by this court to determine whether a petitioner's constitutional rights were violated, it meant, so far as the constitution of the state is concerned, only those constitutional rights of which the petitioner had not been deprived by legislative enactment. While, so far as the constitution of the United States is concerned, it being a law paramount in dignity and force even to the state constitution, the state, not having the power to deny a petitioner the protection of the constitution of the United States, simply made recognition of that fact.

This view is certainly borne out by the language of the constitution itself, by the action of the legislature under it, and by the position taken by Mr. Thelen, a member of and representing the railroad commission, at the oral argument. The grant of power to the legislature being that it may confer upon the railroad commission any additional power that it sees fit, the limitation upon this grant being merely that the powers shall not be *inconsistent* with those conferred by the constitution itself, the declaration of the constitution being that the legislature's power is plenary and unlimited, it neces-

sarily and conclusively follows that the legislature may confer upon the railroad commission in the matter of the management and control of public utilities, in the making of its orders and decrees, in the punishment for the violation of its orders and decrees (all of which subject matters are cognate and germane to and not inconsistent with the constitutional powers conferred) whatsoever authority it may see fit, and that that authority may be exercised without the slightest restraint; every constitutional protection and guaranty, civil and criminal, which the constitution has accorded to all other kinds of property and the owners thereof, are or may be denied to this class of property and its owners.

That this was the view of the law to which the respondent inclined at the oral argument, is manifest from the inquiries put by the justices of this court and by the answers thereto. Thus, the Chief Justice said: "I don't think there is any more important question in this case than the question whether there is anything in any provision of the constitution of this state which limits the power of the legislature to confer powers upon the railroad commission, and if there is any limitation I would like Mr. Thelen himself, as a member and representative of the board of commissioners, to state where he thinks that limitation is—if there is any provision of the state constitution of California to which the powers conferred by this act are in opposition."

"Mr. Thelen: No. It seems to me—my own personal view is they are absolutely clear." Again:

"Mr. Thelen: I think the constitution has given to the legislature every possible authority on this question.

"Mr. Justice Henshaw: It would seem the sole recourse is the federal constitution.

"Mr. Thelen: That is my point. . . .

"My view is that the legislature has the right, irrespective of other provisions of the constitution of this state, to confer power upon the commission, . . . subject to the federal constitution."

The second construction of these constitutional provisions is one which would limit the power which the constitution authorizes the legislature to confer upon the railroad commission strictly to the matter of "supervising and regulating" public utilities. Thus all "additional and different" powers

which the legislature is authorized to confer upon the commission must be powers within this defined and circumscribed limit. The learned attorney for the railroad commission in his printed brief recedes from the position which he took upon oral argument, and contends for this latter construction, basing his contention upon "further study of the section and conference with some of the men who drew the section and who were instrumental in having it submitted to the legislature and having it adopted by the people of the state." But this court in construing a constitutional enactment is limited to the language of the enactment itself. In this instance, as in all others, we may not be governed by what the framers of the amendments meant to say. We are of necessity controlled by what they did say. But, so far as respondent is concerned, the concession yields too much, for, under the first view, the legislature, acting in the matter without any constitutional restraint, was perfectly justified in conferring any powers that it saw fit upon the railroad commission. It could have declared that its decisions were not reviewable by any court of the state, and, of course, having that power, it could limit the scope of review to any particular court, and, still further, limit the hearing before that court. This is precisely what the legislature has done under the sanction of the constitution as first construed. If, however, the view last advanced by the railroad commission is to prevail and the legislative power is pent up and confined to matters of regulation only, then it necessarily follows that its clearly expressed attempt to deprive the superior court of all jurisdiction, its clearly expressed attempt to limit and circumscribe the jurisdiction of this court in some particulars, its further attempt to enlarge the scope of the writ of review, its declared intent to deprive all the courts of the state of the power to say whether a specific order of the commission is reasonable or discriminatory, are one and all violative of state constitutional provisions. More important still, many of the powers expressly conferred upon the commission by sections 40 and 41, giving to the railroad commission the unrestricted right based upon public convenience and necessity, to compel a physical surrender of the properties of one public utility for use by another, upon "a reasonable compensation and reasonable terms

and conditions for the joint use" fixed by the railroad commission itself, themselves do violence to article I, section 14 of the state constitution, which forbids such a taking or injury without compensation fixed by a jury, first made and paid. For the taking of property devoted to a public use from the control of the owners, even though in so doing it be devoted to another public use, is a taking of property within the meaning of the constitution. (*Chicago etc. R. R. Co.* v. *Chicago,* 166 U. S. 226, [41 L. Ed. 979, 17 Sup. Ct. Rep. 581].)

In view of these considerations we regard the conclusion as irresistible that the constitution of this state has in unmistakable language created a commission having control of the public utilities of the state, and has authorized the legislature to confer upon that commission such powers as it may see fit, even to the destruction of the safeguards, privileges, and immunities guaranteed by the constitution to all other kinds of property and its owners. And while, under our republican form of government (a form of government under which the three departments—administrative, executive, and judicial— have in the past one and all been controlled by the limitations of a written constitution. (*In re Duncan,* 139 U. S. 449, [35 L. Ed. 219, 11 Sup. Ct. Rep. 573]), it is perhaps the first instance where a constitution itself has declared that a legislative enactment shall be supreme over all constitutional provisions, nevertheless this is but a reversion to the English form of government which makes an act of parliament the supreme law of the land. It was at one time argued as to such acts of parliament that while not otherwise invalid they would be decreed invalid if "contrary to natural justice or to natural right." But as this determination itself involved a resort to the courts and thus made the decision of the courts to that extent superior to the law of parliament, the present day jurisconsults are agreed that an act of parliament is not controlled by natural right or natural justice, but is controlled solely by what is deemed to be expedient and wise to the law-making power itself. (Bryce's American Commonwealth, chap. 23.) So, here, the state of California has decreed that in all matters touching public utilities the voice of the legislature shall be the supreme law of the land.

Therefore, the following conclusions appear to be irresistible: That when the constitution itself, as here, declares

that a legislative enactment touching a given subject shall not be controlled by any provisions of the written constitution, such a legislative enactment addressed to that subject *ex proprio vigore* carries with it all the force of an act of parliament. Therefore, the same power vested in the legislature which admittedly authorizes it to limit or destroy the jurisdiction of the courts of this state, must necessarily authorize it to confer upon such courts such jurisdiction as it sees fit. To say that the legislature may deprive the courts of all jurisdiction, but may not in any respect enlarge their jurisdiction, where the acts of the railroad commission are involved, is but a stickling over words. There can be no question but that the legislature *meant* to enlarge the jurisdiction of this court by enlarging the scope of the writ of review, since, if it intended merely that the writ of review should remain with the scope which this court and the statutes had previously given it, the act need have said no more than that a writ of review should issue. But the declaration in the act itself that the judgment under the writ of review besides determining "whether the commission has regularly pursued its authority" shall "include" a determination "whether the order or decision under review violates any rights of the petitioner under the constitution of the United States or the state of California" is either deliberately designed to enlarge the purview of the writ of review, or else the language is utter and meaningless surplusage. It is true that the question whether or not an inferior tribunal has exceeded its authority may depend upon whether or not a constitutional right has been violated. If that was all that the legislature meant by its language, it was unnecessary to have added the including clause, since the original scope of the writ of review always has embraced the consideration of such a problem. But it is equally true that many cases arise where constitutional rights are violated, or where it is asserted that they are violated, and where the inferior board and tribunal in so doing has in fact "regularly pursued its authority." This is in precise words declared in *Spring Valley Water Co.* v. *Bryant,* 52 Cal. 138, where it is said, "The resolution and ordinance sought to be annulled may be obnoxious to the criticism that they were attempts to deprive the corporation of its rights and property without due process of law, and violative of constitutional principles. But

neither this nor the circumstance that they were not author-
ized by the city charter to pass them can justify a review
of the action of the board and mayor by *certiorari.''* So, to
repeat, if the legislature had meant that only those constitu-
tional questions which may legitimately arise under the writ
of review should be considered, there was no occasion for its
saying so. Such questions have always been considered. But
if it did mean this, why did it with deliberation add the in-
cluding clause and declare that under the writ of review which
it authorized and prescribed there should be an inquiry as
to whether *any* constitutional right of the petitioner had been
violated?

Therefore, there is the clearest evidence that the legislature
did mean to enlarge the scope of the writ of review and so to
enlarge the jurisdiction of this court in reviewing proceedings.
under this writ. And it may not be said that the legislature
cannot do this, if it has, as is unquestioned, the power to take
away all jurisdiction, which power equally with the power
to enlarge jurisdiction is safeguarded by the general provision
of our constitution and our decisions under them? Could not
the legislature have declared that in any case the railroad
commission may demand and obtain from the supreme court a
writ to review the legality of its orders and decrees, under
which writ the court shall determine whether the constitu-
tional rights of any of the parties interested have in any re-
spect been violated? It is not to be perceived how such a
provision, if it were contained in the act, could be denied
efficacy upon the ground that it was enlarging the jurisdiction
of this court, and equally difficult is it to see how it can be
said that the legislature has not done this precise thing by
other but equally apt words.

This constitutional decree is, of course, binding upon this
court, and under it it becomes the duty of this court to lend
its aid in giving effect to every power and prerogative with
which the legislature may vest or clothe the railroad commis-
sion. This, however, is subject to one all-important limita-
tion. There is still the constitution of the United States—the
supreme law of this state, supreme over its constitution and
over its legislature; and of no protection accorded by that
instrument to a litigant before this court can that litigant be
deprived. Therefore, if it shall be that among the powers

conferred by the legislature upon the railroad commission are those whose exercise by that commission do violence to a petitioner's rights under the constitution of the United States, protection under that constitution will be awarded him.   The fourteenth amendment to the constitution of the United States prohibits a state from depriving any person of life, liberty, or property without due process of law, and from denying to any person within its jurisdiction the equal protection of the laws. The petitioner here insists that by the order of the commission it is deprived of the equal protection of the laws of this state in violation of its rights under the constitution of the United States.

To that inquiry we are next brought.   The subject matter of that inquiry may be thus stated.   The constitution of the state of California (art. I, sec. 14) guarantees that private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court, and that this compensation shall be ascertained by a jury in a court of record, unless a jury be waived.   The petitioner insists that the execution of the order of the railroad commission in the case at bar involves a plain taking of its property, that compensation for this taking has not been made or paid in advance as the constitution provides, has not been made by a jury as the constitution contemplates, and has not been made at all saving as the railroad commission may see fit in the future to apportion rates or tolls for the use of the property which is taken away from the petitioning company and given to its rivals in business.   The petitioner thus asserts that the railroad commissioner's order is an exercise of the right of eminent domain, in violation of the state constitution, in that as to every other class of property and the owners thereof these constitutional guaranties are in full force; that this exceptional exercise of the power of eminent domain by the railroad commission denies to the petitioner the equal protection of the law.   The railroad commission makes answer that its order and the fulfillment of its order are referable solely to the police power of the state and not at all to the power of eminent domain, and that its order amounts to no more than a reasonable regulation touching the use of property held in private ownership, but devoted to a public use. Is the order of the railroad commission properly referable to

the police power, or does it involve, under the guise of a regulatory measure, the taking of petitioner's property?

The courts, even the highest court of the land, have despaired of giving a satisfactory definition to the police power of a state—a definition which will delimit the boundaries of that power. Thus, by Mr. Justice Brewer of the supreme court of the United States, it has been said that "by reason of its undetermined extent, it is the *bete noir* of the courts." By this court, many years ago, it was declared: "So, while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds, affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant." (*Ex parte Jentzsch,* 112 Cal. 468, [32 L. R. A. 664, 44 Pac. 803].) But within the legitimate exercise of this great power comes the unquestioned right to place restrictions upon personal liberty and limitations upon the use of private property. One conspicuous example of the legitimate exercise of the police power is evidenced by the right of regulatory control exercised by courts, boards, and commissions over property held in private ownership, but devoted by the owners to a public use. Over against the undue or illegitimate exercise of the police power is set the limiting and protecting shield of the constitution both of the United States and of this state, that property shall not be taken for public use without compensation to the owner. It must be apparent that in the exercise of the sovereign police power many important questions will arise as to the reasonableness of the law or order. For, if reasonable, then the law or order is but a fair exercise of the sovereign power. If unreasonable it transgresses the constitutional provisions against the taking of private property for public use and unlawfully restricting personal liberty. It is for these reasons that, as has been previously said, the courts have declared it to be a part of their manifest duty to inquire into the question of reasonableness, which right of inquiry, as has also been said, has by the Public Utilities Act, been denied to the courts of this state.

But in the exercise of the police power in the regulation of public utilities, while each case which is rested upon the exercise of that power, must be subject to its own individual consideration, there are certain fundamental principles which are not disputed and which govern all.   The first of these is that this power goes merely to the *regulation* of the public utility, and that when an order passes beyond proper regulation it amounts to a taking of the property and the order is then referable not to the police power but to the power of eminent domain.   The second of these is that this regulatory power falls into three natural subdivisions: 1. The right to regulate tolls and charges, to the end that fair compensation may be returned and excessive charges be forbidden; 2. The right to prevent discrimination upon the part of the public utility directed against those who employ it, or make use of its agencies, or the commodity which it furnishes; 3. The right to make orders and to formulate rules governing the conduct of the public utility, to the end that its efficiency may be built up and maintained and the public and its employees be accorded desirable safeguards and conveniences.   Beyond these matters regulation, as regulation, does not and from the very meaning of the word cannot go.   Nor is it of consequence that the law or order be in terms and in form regulatory, if, in effect, it is a taking of property or a deprivation of the use of property within the meaning of the constitution.   No public convenience, no public necessity, however urgent, will justify such a taking.   Thus, it might be to the great convenience of the public that a hundred foot strip of a railroad's private right of way should be made into a public crossing and highway.   The order of a commission regulating the use upon the part of the railroad of its right of way by exacting of it that it grant permission to the public to cross and recross would not be a regulation, but a confiscation, and this, notwithstanding the fact that the right of way itself was devoted to one public use and the only effort made was to subject it to another public use.   (*Chicago etc. R. R. Co.* v. *Chicago,* 166 U. S. 226, [41 L. Ed. 979, 17 Sup. Ct. Rep. 581].)   In the case cited the order was not even the order of a commission, but was the judgment of a court, yet it was held that the proceedings were in eminent domain and that the railroad company for this new use of its right of

way, which amounted to a taking of its property, was denied the compensation to which the constitution entitled it.

Another principle, quite as important and quite as fundamental, is that "taking" of property within the meaning of the constitution is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of its use. The principle is thus stated by Lewis on Eminent Domain as follows: "If property then consists not in tangible things themselves, but in certain rights in and appurtenant to those things, it follows that when a person is deprived of any of those rights he is to that extent deprived of his property and hence that his property may be taken in the constitutional sense though his title and possession remain undisturbed; and that it may be laid down as a general proposition based upon the nature of property itself that whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the power of eminent domain, his property is *pro tanto* taken and he is entitled to compensation." (2d ed. sec. 56, 3d ed. sec. 65.) "It is also clear that to take the use of property is to take property within the meaning of the constitution. It follows that one company cannot be authorized to take the joint use of another's tracks, except by an exercise of the eminent domain power. All the cases practically concede this by holding that compensation must be made. That it is competent for the legislature to authorize a railroad company to take the right to use the tracks of another railroad jointly, upon making compensation as required by the constitution, is a proposition almost unanimously supported by the authorities." (3d ed. sec. 423.)

Wyman thus states the principle: "The principles discussed do not go so far as to give one common carrier the right to demand the use of the facilities of rival common carriers in order to compete against them. Thus it seems plain that one railroad cannot be required to make physical connection with its rival so that it may take its business away from it." (Wyman on Public Service Corporations, sec. 698.)

And Dillon: "But whatever may be the extent of legislative power in this respect it is clear that the legislature cannot without compensation to the first company authorize the sec-

ond company to take or use the track of the first although with compensation this might be done under the power of eminent domain if in its judgment the public good required it.'' (Dillon on Municipal Corporations, 4th ed., sec. 727, 5th ed., sec. 1280.) This principle, it is to be noted, is not that the legislature, acting directly or through its authorized mandatories, may not subject property devoted by its owners to a public use to another public use, or to the same public use by its rivals, but that the doing of this is an act referable to the power of eminent domain and not to the police power, and that compensation must be made accordingly. Herein lies the vital distinction between the legitimate exercise of the police power and the exercise of the power of eminent domain. In the former, uncompensated obedience to the order is imperative. In the latter, the order may not be enforced without compensation first made. And, finally, it may not be amiss to point out that the devotion to a public use by a person or corporation of property held by them in ownership does not destroy their ownership and does not vest title to the property in the public so as to justify, under the exercise of police power, the taking away of the management and control of the property from its owners without compensation, upon the ground that public convenience would better be served thereby, or that the owners themselves have proven false or derelict in the performance of their public duty. Any law or order seeking to do this passes beyond the ultimate limits of the police power, however vague and undefined those limits may be.

With these indisputable principles before us, we may come directly to the consideration of the order in question. But, at the outset, that consideration is somewhat embarrassed by a very radical change of view upon the part of the attorney of the railroad commission. In oral argument that position seemed to be in consonance with the interpretation which we have put upon the constitutional amendment,—namely, that the legislature had the power, and had exercised the power, to confer upon the railroad commission the right of eminent domain, and in bestowing upon the commission that power had likewise authorized it to fix the compensation when its orders involved a taking of property. Thus, upon oral argument, the record shows the following:

"Mr. Justice Shaw: Your position is that the commission, if empowered by the legislature, could direct one railroad to turn over its whole plant to another railroad without any compensation at all so far as the state constitution is concerned.

"Mr. Thelen: Yes, sir. But the legislature has provided in that case that compensation shall be recovered. I hardly assume any legislature would ever make such a provision, but it might."

Again, the discussion being addressed to the effect of the order here under consideration:

"Mr. Thelen: I may have to concede that it is a taking of property, but if it is a taking of property it is a taking of property under an order of an administrative tribunal and I will refer your honors to a large number of cases where they hold the state has the right to provide that compensation shall be fixed by an administrative tribunal and not by a jury. As long as the party gets his compensation he gets as much as he is entitled to.

"Mr. Justice Shaw: Their claim under the constitution is that if they are entitled to compensation at all—this old company—they are entitled to it in advance.

"Mr. Thelen: If that is their claim we would have to combat that claim under the statute. There was no provision made for compensation. They are going to get a share of the tolls. For all they know they are going to get all or nearly all of them. Their own local exchange is not affected at all. That is certainly sufficient compensation. They are going to get compensation in the shape of a portion of the tolls they are going to get."

In the printed brief of respondent, however, the sole argument is based upon the following declaration: "The railroad commission's order is a regulation under the state's police power of the use of property by a public utility for the purpose to which it has been dedicated and is not a taking of property in the constitutional sense." It would seem, therefore, that the commission's first interpretation of the law was that which the court has here given, and that subsequent reflection had prompted a modification of this view. We repeat, however, that we are still satisfied that it is the only view which can be justly taken of the constitutional pro-

visions, and certainly it is the only view which would give
to the legislative enactments the efficacy and power which were
meant to be theirs.    But, of course, it does not follow, because
the legislature has authorized the railroad commission to exer-
cise the power of eminent domain and take property for
public use, that in this particular instance the commission
has actually done so.    That still is to be determined by the
language of the order, under the restrictions imposed upon
this court denying it the power to consider the reasonable-
ness of the order.    For this discussion must be had, so far as
this court is concerned, under the limitations imposed upon it
by the Public Utilities Act.    We cannot consider the reason-
ableness of the order, but can and must determine whether
any of the petitioner's rights guaranteed it by the constitution
of the United States have been violated.    But while the
reasonableness of the order may thus not be questioned, resort
is permitted to the findings of the commission to aid in deter-
mining the meaning and effect of the order.

These findings disclose that for many years the Pacific
Telephone and Telegraph Company had maintained a long dis-
tance service in the state of California which passed through
the counties of Glenn and Tehama, and in connection with this
long distance service maintained an exchange service in cer-
tain of the towns; but that the local service in each county
and the exchange service between these counties, as main-
tained by the company, was incomplete and inefficient.    The
company for a long time failed to develop the local territory
of these counties.    This poor quality of service and failure
to develop the local business of the counties resulted in the
formation of two companies, the one in Glenn, the other in
Tehama County, one commencing operations in 1908, the other
in 1911.    They developed the territory and gave a local ser-
vice superior to that of the Pacific Company.    After Jan-
uary, 1912, but before this railroad commission came into ex-
istence, the Pacific Company took steps itself to develop the
territory, and prior to March 23, 1912—the effective date of
the Public Utilities Act—it proceeded to parallel "with feverish
haste" and to a considerable extent the lines of the other
companies "in an apparent effort to crush them."    It not
only paralleled existing lines of the other companies, but gave
free exchange service between towns which therefore had not

received such service. Upon April twenty-ninth the Tehama County company had 698 subscribers, of whom 457 did not have a Pacific Company telephone. The Glenn County company had 889 subscribers, of whom 570 did not have a Pacific Company telephone. The Pacific Company operated 870 telephones in Glenn County, and 1003 telephones in Tehama County. This company's investments in each of these counties are greater than that of its competitors. It asserted that it served the same territory that the rival companies do and was ready and able to furnish telephone services to every one of their subscribers at the rates charged them. The finding upon this is that the Pacific Company, while it had duplicated the major portion of the lines of the independent companies, had not duplicated all, and that to serve all the subscribers of the independent companies would require further extensions of its lines. The Glenn and Tehama companies made demand upon the Pacific company for telephonic connections which would enable their subscribers to use the long distance service of the company, and, upon refusal, lodged their complaints. The findings further declare that the Pacific Company had failed to do its duty in the matter of extending its service and affording convenient local communication. This, of course, is not a finding of its present unwillingness or refusal to perform this duty, for it expressed its willingness and urged that it be allowed to perform whatever duties the commission thought incumbent upon it to perform, and it will not be contended, and could not successfully be contended, that a failure to perform a duty is a justification for the taking of property without compensation. The finding is that the local service of the Glenn and Tehama County companies is superior to that of the Pacific Company. An order requiring the Pacific Company to improve its service to the standard fixed by the commission would unquestionably be regulatory in its nature. But the inferiority of service actually rendered is not, of course, a justification for the taking of property. It would undoubtedly, as the commission finds, be a great public convenience and there was great public need for long distance service on behalf of the subscribers of the Glenn and Tehama County companies who did not have the advantage of the long distance service of the other company. But no necessity,

however urgent, justifies a taking of property without compensation, and, as is said in *Evansville etc. Co.* v. *Henderson etc. Co.*, 134 Fed. 973, quoted with approval in 1 Wyman on Public Service Corporations, paragraph 699: "One water company or one telephone company or one telegraph company or one street railway or one railroad company, while bound appropriately to serve the general public, cannot, unless under express statutory enactment and by due process of law thereunder, be compelled to give its property to the uses and benefits of a rival except by some form of condemnation. The rival is not ordinarily to be included in the term 'General Public.'"

These findings of fact have thus been reviewed not at all as touching the *reasonableness* of the order which the commission made which we repeat is not within our purview, but to make plain the proposition that no one nor all of these findings of fact are sufficient to sustain the legality of the order, if in truth it amounts to a taking of property within the constitutional inhibition.

In precise terms then, what is the order and what is its legal effect? It is not an order that the Pacific Telephone and Telegraph Company should improve its own service in these ·counties up to the standard fixed by the railroad commission—an order which would be unquestionably regulatory. It is not an order that the Pacific Company should develop and extend its service to meet the existing demands of the public within the territory it has undertaken to supply—an order which would certainly in its nature be regulatory, and a compliance with which would meet every possible demand which the public could rightly urge. But it is an order compelling the Pacific Company to permit a connection between its long distance lines and the local lines of the petitioning companies, under which, by the use of the switchboards, operators, and lines of the Pacific Company, its property and its agencies, the petitioning companies and their subscribers would have the same rights to all the long distance instrumentalities of the Pacific Company as its subscribers and patrons. That the order is not primarily designed to benefit the public, is made plain from the fact that it is not an order directing the Pacific Company to make betterments and extensions for the service of the public, though admittedly such

betterments and extensions could and would by it be made. That it is primarily designed to benefit the rivals of the Pacific Telephone and Telegraph Company in the local business of the two counties is plain from a consideration of the circumstances, and was admitted by the learned attorney for the railroad commission upon argument, when he declared: "If they (the petitioning companies) cannot get long distance in this way, I assume, unless long distance connection is made, that eventually the local companies will have to give up business." It would appear, therefore, that it is not the necessities of the public but the necessities of and benefits to the rival companies which have prompted an order devoting the property of the Pacific Company to the uses of the rival companies.

But it is argued that this use imposed upon the Pacific Company for the benefit of the petitioning companies is not a new use, but is a use for which the telephone company had already dedicated its property to the public. But to this the telephone company makes answer, which is unquestioned, that it has never dedicated its property to the use of rival and competing companies; that it has dedicated its property to telephone service conducted by itself for the benefit of its own patrons; and to the service of local companies in noncompeting territory; that it is prepared within reason to furnish telephone service to all who are or may desire to become such patrons, and that it has never permitted a connection and use such as here ordered upon the part of a rival company doing a competitive business in a local field and seeking to maintain and improve that business at the cost of the Pacific Company by the advantage which would fall to it from the use of the Pacific Company's long distance lines and service.

Again it is said that the order does not involve a taking of property or the use of property, but is to be likened in principle to those cases where a regulatory order requiring direct connections between two intersecting or contiguous railway companies has been upheld as a not improper exercise of the police power. Finally, the proposition is advanced that, conceding the effect of the order to be a taking of the property, it is a taking by administrative order, referable to the police power—a taking where the injury or damage follows as but an incident to the legitimate exercise of that power, and

where, accordingly, under the august authority of the supreme court of the United States, the taking is not such as is inhibited by the constitution unless compensation be made therefor.

In these contentions respondents greatly rely upon the exact analogy and precise parallelism which they assert exist between this case and those upholding orders for railroad connections. A consideration of the more important of these cases is thus demanded.

The first, and that upon which supreme reliance is placed, is that of *Wisconsin etc. R. R. Co.* v. *Jacobson,* 179 U. S. 287, [45 L. Ed. 194, 21 Sup. Ct. Rep. 115]. By statute the state of Minnesota had ordered common carriers to provide and had ordered its railroad commission to see that they made provision for connecting tracks for the interchange of traffic. Such an order was made for a connection between the Wisconsin etc. Railroad Company and the Sioux Falls Railroad Company. From the judgment of the supreme court of Minnesota sustaining the order the case went to the supreme court of the United States upon writ of error. The supreme court pointed out that the power exercised by the railroad commission could not have been exercised by the courts at common law, and thus primarily depended for its validity upon constitutional or legislative enactment. Next it was pointed out that a fundamental prerequisite to the legality of such an order was its reasonableness, into which the courts would always inquire. Next, again, that to be sustained it must have its foundation in public convenience, welfare, or necessity in the exercise of the police power. The plaintiff in error insisted that the execution of the order would involve a taking of its property without compensation by virtue of the fact that it did business in the transportation of cattle and wood, and that this business would be opened to competition and subjected to serious loss at the hands of the competing railroad. The supreme court of the United States did *not* say that such a competition resulting in loss would not amount to a taking within the constitutional inhibition, but it did declare that such competition did not exist. As to the cattle, its language being: "It may be said, therefore, that competition between the roads for the transportation of such cattle to Sioux Falls does not exist." And as to wood: "To furnish facilities therefor at Hanley Falls so that the wood

from the forests of Northern Minnesota may be brought there on the Willmar Road and transferred in cars to the road of the plaintiff in error and transported to stations west of Hanley Falls is not in fact to compete or to provide for competition with the plaintiff in error in the article of wood." And again, after a statement of the facts which plaintiff in error urged in support of its contention, "that to enforce the judgment would compel it to pay its share in the cost of the construction of a track to be used for the purpose of depriving the company of its traffic and transferring it to its competitor," the supreme court sums up the matter in a single sentence as follows: "The facts do not afford a fair foundation for the argument." And further, the court says: "We think this case is a reasonable exercise of the power of regulation in favor of the interests and for the accommodation of the public, and that it does not, regard being had to the facts, unduly, unfairly, or improperly affect the pecuniary rights or interests of the plaintiff in error." And finally, the opinion concludes: "Although to carry out the judgment may require the exercise by the plaintiff in error of the power of eminent domain, and will also result in some, comparatively speaking, small expense, yet neither fact furnishes an answer to the application of defendant in error." We have been at pains to make these quotations because the decision itself and the language of the opinion is made the foundation for many declarations to the effect that loss by competition is not an element in considering the reasonableness of an order and that property may be taken under such an administrative order without compensation. Thus the supreme court of the United States itself appears to have overstated the decision in the Jacobson case in at least one instance (*Washington* v. *Fairchild,* 224 U. S. 510, [56 L. Ed. 863, 32 Sup. Ct. Rep. 535]), where it is said, discussing that case, that "the advantage to the public was so great that the order requiring the track connection was sustained in spite of the fact that one of the roads was thereby deprived of the revenue which it would otherwise have received for the longer haul." Such is not the Jacobson decision, which is, as above quoted, that there was no competition between the two roads in the matter of hauling cattle or wood. No court will question the justice of the Jacobson decision under the facts de-

clared by the supreme court. But just criticism may be directed against an attempt to extend the decision beyond the court's own statement of the facts and the law and beyond what could by any possibility have been in the minds of the jurists who pronounced it. The decision itself amounts to a declaration that under the authority of the state constitution or statute, a commission or court authorized to exercise the police power in the matter of the regulation of public utilities may, in a proper case, order a physical connection to be made between the tracks of two nearby or intersecting railways, and that though the execution of this order may involve the expenditure of money and may result in the modification of the use of a portion of the railroad right of way over which the connecting track or tracks be carried, such an expenditure of money, when reasonable, and such a limited change of use of the right of way, on the demand of public interest or convenience, are but the outcome of a legitimate exercise of the police power and do not constitute a taking of property without due process of law. Such is the decision and the whole of the decision of the Jacobson case. (See *Grand Trunk Ry. Co.* v. *Michigan Railroad Comm.,* 198 Fed. 1009.) There is in this no declaration that the question of undue competition and injury to business will not be considered, any more than there is a declaration that one railroad may use the tracks of another. There is the distinct declaration that competition was not within the facts of the case.

With the decision of the supreme court in the Jacobson case before us, we may proceed to a brief consideration of the other railroad cases which respondent insists support its contention that an order such as this does not involve a taking of property within the constitutional inhibition. The first of these is *Grand Trunk Ry. Co.* v. *Michigan Railroad Comm.,* 198 Fed. 1009. This case did not even involve the question of the right to order track connections. That was conceded. The contentions were, however, that an intra-city switching duty was imposed and that this switching duty was in no real sense a part of transportation, the language of the court being "The taking of complainant's property without due process is said to result because, as contended, the required services are merely switching services as distinguished from transportation services." The court held the distinction to

be visionary and the contention unsound.    The second contention was that transportation over the lines of the one road by the cars of the other was equivalent to giving the use of the tracks and terminal facilities to the other road.    This contention, too, was held to be without substantial support.

The next case is *State* v. *Jacksonville Terminal Co.*, 41 Fla. 377, [27 South. 225].    The railroad commission of Florida made an order requiring the Jacksonville Terminal Company to admit the Atlantic etc. Co. with its engines, cars, and trains to the use and benefit of its terminal facilities and union depot in the city of Jacksonville to the like extent accorded by the Terminal Company to other railroad companies.    The Atlantic etc. Company was required to pay $1,275 quarter-annually for the use of the terminal facilities and to bear its equitable proportion of the expense of maintenance of the terminal property.    The arguments advanced by the Terminal Company against the validity of the order were based upon the ground that its property was taken without due process of law, and that it was a private corporation engaged in a private business devoting its property to private uses and receiving no franchise or privilege from the state and performing no public or governmental function, and that it could not, therefore, be compelled to devote its property to the use of another private corporation.    To this the court made answer that the facts disclosed that it was a corporation which had devoted its property to a public use and that public use was the providing of terminal facilities for railroads; that having so devoted its property to that use, it could not discriminate in favor of one and against another company seeking connection with it for terminal facilities, and that the order of the commission was therefore not a taking of property, but was a regulation of the use of property within, and not contrary to, the use for which it had been dedicated, was strictly regulatory and within the due exercise of the police power in preventing unjust discrimination. The following quotations will fully substantiate this:

"We have no doubt that property devoted to the uses for which the pleadings show this terminal is devoted is affected with a public interest, and that the state has power to regulate such use by requiring the owner to serve equally and fairly all railroad common carriers which the public welfare

may require, and to confine its charge therefor to reasonable
rates of compensation, and that the exercise of this power
does not deprive the defendant in error of its liberty or prop-
erty without due process of law, under the constitution of this
state or of the United States. . . . The regulation made by
the commissioners under the power conferred upon them in
this case is in no sense an 'appropriation' of any private
property or right of way within the meaning of section 29 of
article XVI of the constitution, so as to require the compen-
sation therefor to be ascertained by a jury of twelve men.
The defendant in error, as we have seen, has devoted its prop-
erty to a use essentially public, is performing service of a
public nature and is subject to be controlled by the public
for the public welfare.   That use to which it has voluntarily
devoted its property is to furnish passenger terminal facili-
ties to railroad common carriers. . . . There is a very clear
distinction between a taking or an appropriation of property
for the public use, and regulating the use of property devoted
to a use in which the public has an interest.   The latter is
an exercise of the 'police power,' as it is called; the former,
of the power of eminent domain.   The state in the former
case compels the dedication of the property or some interest
therein, to a public use, or, if already devoted to one public
use, then to another.   In the latter the owner has voluntarily,
or in pursuance of the provisions of the charter, dedicated
the property to a use in which the public has an interest, and
the use of that property so dedicated is merely regulated and
controlled for the public welfare.   In this case the regulation
complained of does not compel the defendant in error to ded-
icate its property to the public use, or to a different public
use. . . . The regulation complained of does not appropriate
property.   It merely prevents abuses, prohibits unjust dis-
criminations and excessive charges, and is therefore valid.''

The foregoing quotations must make it apparent that here
is no intimation that property may be taken for a public use
without compensation, but, to the contrary, a distinct affirma-
tion that it cannot be so taken, coupled with a declaration,
manifestly just, that there was no taking, but a mere regula-
tion addressed to the public use to which the property had
been dedicated,—a regulation to prevent discrimination.

In *Pittsburg etc. Ry. Co.* v. *Railroad Commission of Indiana,* 171 Ind. 189, [86 N. E. 328], the railroad commission of Indiana had made its order requiring track connections between two roads. The supreme court of Indiana declared that the reasonableness of the order would be considered, that the railroad's property was devoted to a public use and that it was therefore subject to due regulation, and that if the order was not an unreasonable regulation it did not amount to the taking of property in violation of the constitution. The court held that the order, referable to the police power, was a reasonable regulation touching the use of property.

Finally, in the case of *Washington* v. *Fairchild,* 224 U. S. 510, [56 L. Ed. 863, 32 Sup. Ct. Rep. 535], respondent contends that it finds the fullest support for the proposition that it may actually take property without compensation, or without compensation first made and paid as our constitution requires. In the last cited case the order of the Washington railroad commisssion required the Oregon Railway & Navigation Company and the Northern Pacific Railway Company and the Spokane & Inland R. R. Company to connect their tracks at a number of named towns and stations. The *decision* of the supreme court reversed this order for its unreasonableness. The *opinion* employs language which gives rise to uncertainty and which if not properly understood, must result in great confusion. Thus, in the opening sentence of the opinion, it is said: "The commission's order requiring the Oregon company to make track connection was not a mere administrative regulation, but it was a taking of property, since it compelled the defendant to expend money and prevented it from using for other purposes, the land on which the tracks were to be laid." And further declares the opinion: "So that where the taking is under an administrative regulation, the defendant must not be denied the right to show that as matter of law the order was so arbitrary, unjust or unreasonable as to amount to a deprivation of property in violation of the fourteenth amendment." Elsewhere the court states the proposition to be "the contention that as a matter of law the order, on the facts proved, was so unreasonable as to amount to a taking of property without due process of law."

If these expressions should be construed as respondent seeks to have them construed, as meaning that the supreme court of the United States has decided that in the exercise of the police power private property may be lawfully taken for public use without compensation made to the owner, it must be said that it is the first and only declaration of the supreme court of the United States to that effect, and that the statement itself means the elimination from the constitution of the United States of the last clause of the fifth amendment of that constitution, declaring that private property shall not be taken for public use without just compensation. In a sense, every exercise of the police power which calls for the expenditure of money by the owner of property, or limits, or otherwise regulates the use which an owner may make of his property, whether or not that property be dedicated to a public use, is a taking of property. Thus the requirement that fire escapes be placed upon buildings which have them not necessitates the expenditure of money by the owners of such buildings, and in that limited sense is a taking of their property. The requirement that one maintaining a nuisance shall abate it may necessitate upon his part the expenditure of money in so doing, and in that narrow sense is a taking of his property. The well recognized legal restrictions upon the use of property, prohibiting the use for slaughter houses, powder mills, and the like, are all in a limited sense a taking of property. So, too, the requirement of track connections' obviously involves the expenditure of money and a limitation upon the original use, for the original use of the right of way was for the tracks alone of the railroad which owned it. By the track connection, a portion of that right of way is subjected to the use of the connecting track, which is owned perhaps—operated in common certainly—by the two railroads. But, unless we have read the law to no purpose, the vitally essential principle limiting the exercise of the police power and distinguishing it from the exercise of the power of eminent domain, is that private rights in the former case must, for the benefit of society, yield to reasonable regulations controlling the use of property, in the case of public utilities, *within the use* to which the property has been dedicated. The law has the power to regulate the use to increase efficiency and prevent abuses, and such regulations, though

they involve an expenditure of money or a modification of the use, are regulations which the law-making power may impose by virtue of the very fact that the property has been dedicated to that public use. Therefore, it is that the decisions declare either that such a regulation is not a taking within the constitutional inhibition, or declare that the regulation being legal, the mere fact that the expenditure of money is involved in no sense amounts to a taking. But when, however, the regulation exceeds the just limits of the police power, that regulation is void, whether or not it amounts to a taking of the property within the constitution. Many such orders do, under the guise of regulations, invade the province of eminent domain and work an uncompensated taking of property which is confiscation. Such orders are, of course, void. Others, without necessitating the expenditure of money, so unreasonably restrict or so unreasonably enlarge the use of property for the supposed benefit of the public as to accomplish the same results. We think it certain that it is in the light of these fundamental principles that the language of the supreme court in the Oregon Railway case must be read; for if construed in any other way, there is an obliteration of all distinction between the power of eminent domain and the police power and the equivalent of a declaration that a railroad commission may take property for public use without compensation to the owner. Therefore, as we construe the decision under consideration, the meaning of what the supreme court said was either that under the guise of an administrative police regulation, the commission had taken property in violation of the constitution, or that the effect of upholding the regulation in question would be sanctioning such a taking in violation of the constitution. It was as though the supreme court had declared that this administrative order for track connections is so unreasonable as to pass beyond the limits of the police power in the matter of regulation and to enter the field of the power of eminent domain. In the latter field it is a taking of property without compensation. If by any possibility this court can be wrong in the construction which it thus puts upon this language, this informing knowledge must come from the supreme court of the United States itself.

But that what we have above set forth has been the distinction uniformly drawn by the federal courts between the police power and the power of eminent domain, a review of a few of the many cases will abundantly establish. Thus in *Fidelity Trust & Safety Vault Co.* v. *Mobile St. Ry. Co.*, 53 Fed. 687, it is said: "The use of five blocks of the roadbed of a street railway in the hands of a receiver by another street railway company materially impairs the just enjoyment of the property, and will be enjoined at the instance of the receiver. One public corporation cannot take the franchise of another which is in use, unless expressly authorized by the legislature, and then only by regular condemnation; and cannot take it at all if this will materially affect its use. A franchise for a right of way is in its very nature exclusive, and dispossession of any portion thereof in actual use is a taking of the franchise *pro tanto.*" And to the same purpose and like effect are *Missouri Pacific Ry. Co.* v. *Nebraska*, 164 U. S. 403, [41 L. Ed. 489, 17 Sup. Ct. Rep. 130] ; *Missouri Pacific Ry. Co.* v. *Nebraska*, 217 U. S. 196, [18 Ann. Cas. 989, 54 L. Ed. 727, 30 Sup. Ct. Rep. 461], in which cases it was held that an order directing a railway company to allow a warehouse to be constructed on its right of way to aid transportation facilities was a taking of property which could not be sustained as a police regulation. And finally, may be quoted the language of the court in *Grand Trunk Ry. Co.* v. *Michigan Railroad Comm.*, 198 Fed. 1009, as follows: "That requirements of track connections and interchange of traffic between railroads imposed by the Michigan statutes previous to 1911 do not amount to the taking of property without due process needs no extended reference to authority." (See, also, *Interstate Commerce Commission* v. *Union Pacific R. R.*, 222 U. S. 541, [56 L. Ed. 308, 32 Sup. Ct. Rep. 108].) That the state courts are a unit upon the same proposition, if not sufficiently established by the citations of authority already made, will be further shown by a reference to *Junction Creek etc.* v. *City of Durango*, 21 Colo. 194, [40 Pac. 356] ; *Commonwealth* v. *Norfolk Ry. Co.*, 111 Va. 59, [68 S. E. 351] ; *Missouri etc. Ry. Co.* v. *Richardson*, 25 Okl. 640, [106 Pac. 1108] ; *Canal etc. Co.* v. *Orleans R. Co.*, 44 La. Ann. 54, [10 South. 389] ; *Norfolk & Western Ry. Co.* v. *Tidewater Co.*, 105 Va. 129, [52 S. E. 852] ; *Toledo etc. Ry. Co.* v. *Toledo*

*Electric etc. Co.*, 50 Ohio St. 603, [36 N. E. 312]; *State* v. *Cadwallader*, 172 Ind. 619, [87 N. E. 644, 89 N. E. 319]'; *Attorney-General* v. *Boston and A. R. Co.*, 160 Mass. 62, [22 L. R. A. 112, 35 N. E. 252]; *Mississippi R. R. Co.* v. *Yazoo etc. R. Co.*, 100 Miss. 595, [56 South. 668]; *Commonwealth* v. *Boston Advertising Co.*, 188 Mass. 348, [108 Am. St. Rep. 494, 69 L. R. A. 817, 74 N. E. 601].

Therefore, it must be said that the conclusion may not be evaded that the authorities are unanimous in declaring that in dealing with public utilities, regulation of use within the dedicated use is as far as the police power may be extended, and that when the regulation exceeds this, it is always void for unreasonableness and may, depending upon the form and character of the order, be also void as an attempt to take property without compensation in violation of the constitutional protection. This does not mean that a board or commission authorized thereto may not itself exercise the power of eminent domain and so take property for public use. But when such board or commission attempts to do this, it must do it after compensation paid to the owner.

From this consideration of the railroad cases we pass to a review of the telephone cases which it is asserted support the commissioner's order. They are but two in number. The first of these is *Billings Mutual Telephone Co.* v. *Rocky Mountain Bell Telephone Co.*, 155 Fed. 208. The circuit court had before it the application of the Mutual Telephone Company, doing a local business in Billings, Montana, for an order compelling the defendant telephone company to permit it to make connections and use the latter's long distance lines and service. The action was in eminent domain, plaintiff seeking a decree of the court "upon such terms and for such compensation as the court may deem just," and praying that "the court may proceed by law to determine the right to connect and the value of the services and use of defendant's lines." The defendant itself was operating a competing local line in Billings, and pleaded this and other facts declaring that public convenience did not require the connection, that the result of the order would be a taking of defendant's property for no higher public use, and therefore, a taking unauthorized by law. Many other matters of special defense were urged, but the foregoing statement is sufficient for the

purposes of the present consideration.  At the outset then it
is to be noted that the action was not addressed to the con-
sideration of any regulatory measure under the police power,
but that it was a judicial action where the power of eminent
domain was sought to be exercised.  Thus the case is founded
upon the fundamentals that defendant's property was to be
taken, and that compensation should and would be made for
such taking.  The defenses, one and all, were grounded upon
the proposition that even in eminent domain proceedings de-
fendant's property could not be taken excepting for a higher
use and that the use contemplated was not a higher use.  The
decision of the court quotes section 14 of article XV of the
constitution of Montana, as follows: ''Any association or cor-
poration, or the lessees or managers thereof, organized for the
purpose, or any individual, shall have the right to construct
or maintain lines of telegraph or telephone within this state
and connect the same with other lines; and the legislative
assembly shall by a general law of uniform operation provide
reasonable regulations to give full effect to this section.''
Following this constitutional authorization, the Civil Code of
Montana reaffirmed the constitutional declaration as to the
right of telephone companies to connect with each other's
lines and further declared that in case they could not do this
by agreement, proceedings might be taken ''and the damages
assesssed and the right of connection granted as provided in
the Code of Civil Procedure.''  It is argued by respondent
that the legislature so declared because there was in existence
no administrative board vested with power to fix or withhold
compensation.  We cannot of course judicially know this to
be true, but certain it is that the legislature of Montana re-
garded such a use as a taking of property referable to the
power of eminent domain and made provision accordingly.
This, moreover, was the view of the learned circuit judge, as
will abundantly appear from the language of his opinion.
His holding was that the defendant had ''erected its system
subject to the reasonable impositions that might be put upon
it by the constitution and laws of the state,'' and that it was
therefore under a duty ''to allow such a connection and use.''
And says the court ''the spirit of the constitution and the
letter of the laws of the state in which defendant operates
its lines compel it, under its primal duty to the public, to

yield to the right of plaintiff company to connect its lines with the defendant's and to enjoy the use thereof in a reasonable and effective way, *provided of course damages are paid as required by law.*" We are unable to perceive how this case can successfully be called to the support of an administrative order which respondent earnestly insists is referable to the police power alone, and which refuses to recognize any right of compensation for the taking of the use. The only other case cited by respondents is *Pioneer Tel. & Tel. Co.* v. *Grant County Rural Tel. Co.* (Okl.), 119 Pac. 968. The supreme court of Oklahoma granted a rehearing in the case, and for this reason undoubtedly the decision does not appear in the authorized volumes of the Oklahoma reports, but it may be treated as an existing decision meriting consideration for the principles which it may announce and the reasoning upon which they may be based. The application was by the Grant County Rural Telephone Company to compel the Pioneer Telephone and Telegraph Company to permit it to make connections. The petitioning company was a mutual company operating locally. Both companies were organized under the constitution and laws of Oklahoma. Section 5 of article IX of that constitution provides that: "All telephone and telegraph lines operated for hire shall each respectively receive and transmit each other's messages without delay or discrimination, and make such physical connections with each other's lines under such rules and regulations as shall be prescribed by law or by any commission created by this constitution or by any act of the legislature for that purpose. Section 18 of article IX of the constitution authorized the creation of a commission having "the power and authority to be charged with the duty of supervising, regulating, and controlling all transportation and transmission companies doing business in this state." This corporation commission had ordered the appealing company to permit connection to be made. The court of Oklahoma found and declared: "The appellant is engaged in a general public telephone business throughout the state, furnishing exchange telephone service from various exchange plants located in many cities and towns within the state, including the city of Pond Creek, and also furnishing toll or long distance service over its toll or long distance lines constructed generally throughout the

state, including toll or long distance service to and from the
city of Pond Creek.'' The decision of the court declares:
''When appellant procured its charter and its franchise to
engage in this public service business, it did it with the full
knowledge that it thereby became an agency of the state,
subject to its control and regulation, under the exercise of its
police power, for the comfort and convenience of the citizens
of the state (31 Cyc. 902), subject to the condition that ap-
pellant's property should not be taken, except by due process
of law. When a fair and just compensation is afforded for
such convenience, facility, and service, that constitutional
requirement is satisfied. The order of the commission, as
modified, must be affirmed.'' What then is this decision?
It is that the appellant company had taken its franchise from
the state of Oklahoma and had engaged in business subject to
its constitution and its laws; that the constitution required
such telephone companies to permit connections with others
and the use by such others of their instrumentalities; more-
over, that this precise thing was the business in which the
appellant company was engaged. It had dedicated its prop-
erty to the public use of furnishing such long distance ser-
vice to local companies. Therefore the order compelling the
company to permit a connection with the Grant County Rural
Company was not the taking of appellant's property for a
new use, but was a mere regulation of the use, which it was
obliged by its charter, accepted under the constitution of
Oklahoma, to acknowledge; and the use to which in fact it
had publicly dedicated its property. Herein the case is simi-
lar to the Florida Terminal Railway case above discussed and
distinguished from *Louisville & Nashville Railway Co.* v.
*Central Stockyards Co.*, 212 U. S. 132, [53 L. Ed. 441, 29
Sup. Ct. Rep. 246], where the demand for the right to occupy
and use the terminal facilities of a railroad company which
had not dedicated its property to such a public use was held
to be an effort to take that property within the meaning
of the constitution. And, finally, it is to be noted that the
supreme court of Oklahoma in the last two sentences quoted
from its opinion, itself makes distinct recognition and affirm-
ance of the fact, that fair and just compensation must be
granted to comply with the constitutional requirement
against unlawful taking. Again we fail to perceive any force

to this decision as applied to the present case, where under the charter of the petitioning company it was not subjected to any such right of connections and where the company had never dedicated its property to such use by competing lines.

The principles to be deduced from the authorities may be thus summed up: Such a use by physical connection between two telephone companies could not be decreed by any court or commission, in the absence of an authorizing statute. Where the constitution or laws of a state declare that such use shall be permitted, it will be held that a corporation or an individual which thereafter enters upon the business does so having in law dedicated its property to this public use, that is to say, to the use of allowing even competing lines to make connection with and use of its telephone service. Where, regardless of such constitutional or statutory provision, a company has actually dedicated its property to such use, it will not be allowed to indulge in unjust discrimination by arbitrarily refusing to one the connection and use which it has permitted to others. In these two classes of cases there is no change of use, and consequently no taking of property, but there is a regulation of use and the compensation to be allowed need not necessarily be a compensation paid in advance other than such as will equitably compensate for the cost of connection, but will be a compensation for the future service which may be fairly adjusted by rates and tolls. In all other cases such an order for a physical connection does involve a taking of property within the constitution, for which compensation must be made. It would seem that the matter would become quite apparent if the order in this case had decreed that for the transmission of messages the Pacific Telephone Company should turn over its agencies and instrumentalities to the Glenn County and Tehama County companies for one hour out of each twenty-four. That the order actually made requires the Pacific Telephone Company to do this same thing for five minutes or ten minutes at a time during any and every hour of the day may tend to obscure the fact that it is a taking, but does not change it. In this connection we cannot do better than to quote at some length from the well-considered case of *State* v. *Cadwallader,* 172 Ind. 619, [87 N. E. 644, 89 N. E. 319], where the supreme court of Indiana had under consideration some of these very questions: "By

analogy, and by statute, where they are constructed or maintained for the public for profit, or charges are made for their use, individuals conducting telephone exchanges are subject to the same obligations as corporations with respect to equal facilities and equal charges and freedom from discrimination and partiality as against any person, persons or corporations in like situation, conducting a lawful business. (Burn's Ann. Stats. 1908, sec. 5802.) This duty does not amount to an absolute requirement that one company or individual shall furnish the patrons of another the use of its or his exchange and lines unless it has been voluntarily undertaken, so that he or it may not afterward discriminate in classification. Patrons of the corporation or individual contracted with are bound to know that, in the absence of an undertaking so to do, another corporation or individual is not bound to subject its or his property to their use by direct or unrestricted use of their lines. Telephone exchanges conducted for the benefit of the public for compensation may fairly be said to be impressed with a public interest, but their public character depends upon the nature, and not the extent, of their business. Each agency or exchange conducted by a corporate entity or individual is separate and distinct from all others with respect to the conduct of its business and in its relation to the public, and owes duties of an impartial character and free from discrimination to all who are like circumstanced. The fact that it is a *quasi* public agent, by reason of being impressed with a public interest, is only so to the extent that it owes an impartial duty to all with respect to its particular capacity and undertakings from its or his own initiative agreement, or consent. If this were not true, it will readily be seen that any one who saw fit could, by establishing a telephone exchange and procuring few or many patrons, or if a once extensive field of operations had existed when the relation began, which furnished the consideration, but had dwindled to small proportions, so that there would be practically no return to the one for the service to the other, could insist on connection with and service through indefinite extensions, and produce an inequality which in itself would be inequitable and lacking in consideration. If the right to such connection were once admitted to exist, as an abstract right, it would not depend upon the number of patrons, but

upon the question of individual right, and it must be based upon that right if it exist at all, in the absence of contract, express or implied, for there would be no means of determining where the particular plant, exchange or property becomes or ceases to be impressed with a public interest. It could only be thus impressed by the character of the use, and not by the number of users. The effect would be the destruction of the private right of contract, and would amount to practical confiscation of another's property.

"When a business becomes that of a common carrier, it becomes impressed with the common law duty of receiving from a connecting carrier and transporting commodities, the same as if offered by an individual, and so here, relator and his patrons through him, upon compliance with the reasonable rules and regulations and payment of the compensation which is ordinarily charged to others, would be entitled to have his and their messages handled and transmitted by appellee's exchange; but that is a very different thing, in the absence of contract, from the demand that a physical connection shall be maintained involuntarily, and as of right, when from the character of the business itself the control of appellee's plant would be in a measure wrested from him and subjected to the administration of another, or many others. The private right of property and of contract may not thus be interfered with, and we are treating now only of the relations of these *quasi* public utilities, where there is no statutory regulation and no contractual relation express or implied."

There can be no escape then from the conclusion that the order here before us involves a taking of the property within the meaning of the constitution, and that the taking, without regard to the authority of the commissioners to exercise the power of eminent domain, is a taking without compensation, respondent itself insisting upon this view of the case, saying: "The commission has at no time contended or admitted that any compensation is due petitioner for a taking of its property. The compensation referred to is compensation to be paid to petitioner for services rendered in receiving and transmitting long distance telephone messages." It therefore stands admitted, as indeed it must, that for the taking no compensation whatsoever is made. And of course it cannot be contended and is not contended that an apportionment

of rates or tolls for a service to be rendered in the future is a compensation for the present taking of property, and as little can it be said that the allocation of such rates and tolls to be earned in the future can ever measure up to the constitutional requirement that property shall not be taken without compensation first made and paid to the owner. (*Attorney-General* v. *Old Colony Railroad,* 160 Mass. 62, [22 L. R. A. 112, 35 N. E. 252].)

This consideration has been addressed principally to the proposition of the taking of property by the subjection of it to a new use. There is, however, within this case, as has previously been outlined, the further contention that there is an additional taking, in that the property of the company is turned over to the use of a competing company, to the manifest and proved injury to petitioner's local business. We need not dwell upon this further than to say that it is well established by the quotations and citations above given that this is an added element of injury in the taking and a proper matter for compensation.

There is left for consideration one other proposition which is not presented in argument but which necessarily arises under the interpretation which we have given to the amended provisions of our constitution. That interpretation, as we have said, makes paramount even to the constitution itself the powers which the legislature may see fit to confer upon the railroad commission. Amongst those powers is that which authorizes the commission to sit as a tribunal in the exercise of the power of eminent domain and to fix compensation under its awards. This clearly is a power at variance with that constitutional provision above quoted which declares that compensation for the taking of property shall be assessed by a jury and paid into court. It is the equivalent of saying that in the case of public utilities the power of eminent domain shall be exercised and damage assessed by the railroad commission, while the owners of all other kinds of property shall have this assessment made in court by a jury. Conceding this discrimination to be valid so far as the state constitution is concerned, either because it is an amendment superior to all constitutional provisions, or because from the nature of public utilities and the difficulties in assessing damages for the taking, a distinction may be drawn and a differ-

ent mode provided, there is still left the problem whether or no the rights of public utilities are violated, in that this would be a denial to them of the equal protection of the law. This problem is of no practical consequence in the present case, for, as has been said, there is no contention upon the part of the respondent that it allowed any compensation whatever for the taking of property.

In the consideration of this problem our constitution (art. I, sec. 14) is to be read as though amended by the proviso, that in the case of all public utilities the power of eminent domain may by authority of the legislature be vested in the railroad commission, with power to that body to determine the public convenience or necessity and make an award for damages without the intervention of a jury. The requirement of a jury and of a prepayment of damages is not a part of the federal constitution nor of that of many of our states. It is in those jurisdictions quite a common practice to create boards and commissions to exercise the power on behalf of the state and to make awards between litigants. It is certainly true that in the vast modern development of public utilities in their multifarious activities, in their complicated interrelations, where a taking of property is involved, a great saving of time and a more just award may be expected from a learned, skilled and dispassionate tribunal such as the railroad commission than can ever be hoped for from the haphazard verdicts of juries. And very good reasons therefore appear, why, for the benefit of the state as well as for the benefit of the public service companies, awards as to the latter should be made by this body and not by a jury. It is therefore concluded that no violence is done to the rights of petitioner under the constitution of the United States by this proviso of the state constitution authorizing the railroad commission to exercise the power of eminent domain and assess damages for a taking of property.

But while the compensatory award in such cases rests with the railroad commission, it is still the duty of that commission to make compensation for such a taking. This not only by virtue of section 14 of article I of the constitution, but as well by the provisions of the Public Utilities Act itself. For example, in section 41, dealing with the taking of property through the use thereof, the act declares that the railroad com-

mission shall "prescribe a reasonable compensation and reasonable terms and conditions for the joint use." We do not find in the Public Utilities Act any intent to deprive a public utility, whose property is so taken, of the compensation *in advance,* which is the due, under our state constitution, of the owner of any other kind of property. So that, while in this class of cases, the jury is eliminated and the award of the railroad commission substituted for the jury's verdict, it still remains as a part of our constitution that the compensation decreed to the public utility for a taking of its property shall be paid in advance of such actual taking.

We may now sum up our conclusions as follows:

1. The constitution has, in the railroad commission, created both a court and an administrative tribunal.

2. The constitution has authorized the legislature to confer additional and different powers upon this commission touching public utilities unrestrained by other constitutional provisions.

3. The legality of such powers as the legislature has or may thus confer upon the commission, if cognate and germane to the subject of public utilities, may not be questioned under the state constitution.

4. That therefore the deprivation of jurisdiction of the courts of the state may not be questioned.

5. That therefore the reasonableness of the railroad commission's orders and decrees may not be inquired into by any court of this state and consequently is of federal cognizance only.

6. That the right to exercise the power of eminent domain in matters involving public utilities has been vested by the legislature in the railroad commission and that the exercise of this power and the making of awards thereunder without the intervention and verdict of a jury are not in violation of the constitution of this state or of the United States.

7. That payment of such awards must be made in advance of the actual taking.

8. That the order in question involves an exercise of the power of eminent domain and not of the police power.

9. That the order in question admittedly gives no compensation for the taking of petitioner's property and is therefore

CLXVI Cal.—44

void by force and virtue of the constitution of the state and of the United States.

10. That the order in question must therefore be and it hereby is annulled.

Lorigan, J., and Melvin, J., concurred.

SLOSS, J., concurring.—I agree with the conclusion that the order under review should be annulled, and concur in the judgment so declaring, but cannot assent entirely to the reasoning by which this result is reached. Important as is the determination of the right of the railroad commission to order the physical connection which it has here directed to be made between the lines of the petitioner and those of the Glenn and Tehama companies, more important still is the correct ascertainment of the extent of the power of this court to review orders of the railroad commission under the writ provided for in section 67 of the Public Utilities Act, or otherwise. What orders may be reviewed, what claims of right may be examined here? The correct determination of these questions lies at the base of the decision, not only of the particular case before us, but of the similar proceedings already pending, and numerous others which will undoubtedly be brought to test the exercise by the railroad commission of the authority vested or believed to be vested in it. I think it proper, therefore, to state, in some detail, my views on these fundamental questions, and to point out how far those views are not in complete accord with the conclusions expressed in Justice Henshaw's opinion.

The courts of this state derive their powers and jurisdiction from the constitution of the state. The constitutional jurisdiction can neither be restricted nor enlarged by legislative act. An attempt to take away from the courts judicial power conferred upon them by the constitution, or to impose upon them judicial powers not granted or authorized to be granted by the constitution is void. This declaration is not only in accord with the decisions elsewhere (*Marbury* v. *Madison,* 1 Cranch (U. S.), 137 [2 L. Ed. 60]), but has been held by this court from the early history of the state (*Thompson* v *Williams,* 6 Cal. 88; *Hicks* v. *Bell,* 3 Cal. 219; *Burgoyne* v. *Supervisors,* 5 Cal. 9; *Parsons* v. *Tuolumne Water Co.,* 5

Cal. 43, [63 Am. Dec. 76] ; *People* v. *Applegate,* 5 Cal. 295;
*Fitzgerald* v. *Urton,* 4 Cal. 235; *Wilson* v. *Roach,* 4 Cal. 362;
*Zander* v. *Coe,* 5 Cal. 230; *Haight* v. *Gay,* 8 Cal. 297, [68
Am. Dec. 323] ; *People* v. *Peralta,* 3 Cal. 379; *Caulfield* v.
*Hudson,* 3 Cal. 389; *In re Jessup,* 81 Cal. 408, [6 L. R. A. 594,
21 Pac. 976, 22 Pac. 742, 1028] ; *Tulare* v. *Hevren,* 126 Cal.
226, 228, [58 Pac. 530] ; *Chinn* v. *Superior Court,* 156 Cal.
479, [105 Pac. 580] ). It is still the rule except in so far
as it may have been modified by changes in the constitution
itself.

By the amendment in 1911 of section 22 of article XII,
creating a railroad commission, it is provided that "No pro-
vision of this constitution shall be construed as a limitation
upon the authority of the legislature to confer upon the rail-
road commission additional powers of the same kind or differ-
ent from those conferred herein, which are not inconsistent
with the powers conferred upon the railroad commission in
this constitution, and the authority of the legislature to con-
fer such additional powers is expressly declared to be plenary
and unlimited by any provision of this constitution." And
section 23 of the same article, defining public utilities and
declaring that they are subject to the control and regulation
of the railroad commission, provides that "the right of the
legislature to confer powers upon the railroad commission
respecting public utilities is hereby declared to be plenary
and to be unlimited by any provision of this constitution."
To the extent, then, that the legislature has acted in confer-
ring powers (germane to the subject of the regulation and
control of public utilities) upon the railroad commission, it
necessarily follows that the validity of such grant of powers
is not to be questioned by reason of any other provision of
the state constitution. This position is fully developed in
Justice Henshaw's opinion. It would seem to follow, too,
that if a legislative grant of power to the railroad commission
is so extensive in terms as to exclude or limit the power of
any court to question or review the order of the commission,
such exclusion or limitation must be recognized as valid, al-
though it amounts to a restriction of a part of the jurisdic-
tion conferred upon the courts by other parts of the constitu-
tion. If the legislature has plenary power to confer powers
upon the railroad commission, it may declare that the orders

of the railroad commission shall be final and conclusive and not subject to review by any court of this state. Such declaration would be an exercise of the unlimited power of the legislature to confer additional powers upon the railroad commission. If the legislature may, as a part of its grant of powers to the railroad commission, take away all right of the courts to review the orders of the commission, manifestly it may take away a part of such right, by providing that the acts of the commission shall be subject to only a limited and specified review. There can, then, be no objection, under the constitution of this state, to the provision of the Public Utilities Act (sec. 67) that "no court of this state (except the supreme court to the extent herein specified) shall have jurisdiction to review, reverse, correct or annul any order or decision of the commission, or to suspend or delay the execution or operation thereof, or to enjoin, restrain or interfere with the commission in the performance of its official duties; provided that the writ of *mandamus* shall lie from the supreme court to the commission in all proper cases." I fully agree, therefore, with Justice Henshaw's view that section 67 of the Public Utilities Act is valid and effective in so far as it takes from every court, except the supreme court, the power to review or suspend any order of the commission, and in so far as it takes from the supreme court the power to review such orders in any mode other than those specially permitted by the act, to wit, by writ of review or *mandamus*.

But the conclusion that the amendments to sections 22 and 23 of article XII of the constitution authorize the legislature to take away or to *limit* the jurisdiction of the courts with respect to orders and decisions of the railroad commission does not carry with it the conclusion that the legislature is authorized to *enlarge* the constitutional jurisdiction of any court of this state. These amendments do not give to the legislature any right to alter the jurisdiction of the courts except to the extent that such alteration is involved in a grant of power to the railroad commission. To say that the orders of the railroad commission shall not be subject to review is to confer upon the railroad commission a greater or more absolute power than it would have if its orders were subject to review in the regular course of judicial procedure. To say, however, that any court shall have a jurisdiction beyond that

conferred upon it by the constitution, to review, annul, or modify an order of the railroad commission is not to grant additional or other powers to the railroad commission. It is, on the contrary, to limit the power of the railroad commission and to grant additional powers to the courts. There is nothing in the amendments of 1911 which authorizes such extension by the legislature of the jurisdiction of the courts. The rule must, therefore, be now, as it has always been, that any legislative attempt to confer upon the courts powers beyond those conferred by the constitution is void.

The jurisdiction of the supreme court is carefully defined by the constitution. The court has jurisdiction on appeal from the superior court in certain cases. It also has appellate jurisdiction in matters pending before a district court of appeal which shall be ordered by the supreme court to be transferred to itself, and it has original jurisdiction to issue writs of *mandamus, certiorari,* prohibition and *habeas corpus,* and all other writs necessary or proper to the complete exercise of its appellate jurisdiction. The Public Utilities Act does not attempt to confer upon this court any appellate jurisdiction. Under the views already expressed it is not competent for the legislature to confer upon the supreme court any original jurisdiction which is not embraced within one or the other of the writs above mentioned, i. e., *mandamus, certiorari,* prohibition and *habeas corpus* and all other writs necessary or proper to the complete exercise of its appellate jurisdiction.

Section 67 of the act provides that the party against whom a decision is rendered by the railroad commission may apply to the supreme court for a writ of *certiorari* or review for the purpose of having the lawfulness of the order inquired into and determined. The writ of review (*certiorari*) is one of the writs which, under section 4 of article VI of the constitution, is within the original jurisdiction of the supreme court. To the extent, then, that *certiorari* is an appropriate remedy to review the orders of the commission, this court would have had power to issue such a writ if the Public Utilities Act had been silent on the subject of the right of the courts to examine the acts of the commission. And, considering the settled rule with respect to the power of the legislature to enlarge the constitutional jurisdiction of the

courts, the power to issue a writ of review and to dispose of the questions arising under it is to be regarded as derived primarily from the constitution, rather than from section 67 of the Public Utilities Act.

The writs embraced in the grant of original jurisdiction contained in section 4 of article VI of the constitution are the designated writs as they were understood and defined at the time the constitution was adopted, and the legislature has no power to extend the scope of the writs as thus limited. (*Maurer* v. *Mitchell,* 53 Cal. 291; *Camron* v. *Kenfield,* 57 Cal. 550.)    The writ of review, as is well settled in this state, is issued only to an officer or tribunal exercising judicial functions.    It lies for the purpose of reviewing only judicial or *quasi* judicial proceedings.    (*People* v. *Bush,* 40 Cal. 346; *Quinchard* v. *Board of Trustees,* 113 Cal. 664, [45 Pac. 856]; *Cook* v. *Civil Service Comm.,* 160 Cal. 589, [117 Pac. 663].) It does not lie to review errors of fact or law, but only to determine whether an officer, board, or tribunal has exceeded his or its jurisdiction.    This is the purpose of the writ as declared by section 1068 of the Code of Civil Procedure. . The provision of section 1074 of the same code (enacted prior to the adoption of the constitution of 1879), that the review cannot be extended further than to determine whether the inferior tribunal, board, or officer "has regularly pursued the authority of such tribunal, board, or officer" did not assume to enlarge the range of inquiry.    This court has expressly held that the clause "whether the tribunal has regularly pursued its authority" is the equivalent of "whether it has exceeded its jurisdiction."    (*Central Pacific R. R. Co.* v. *Placer County,* 43 Cal. 365; *Quinchard* v. *Board of Trustees,* 113 Cal. 664, [45 Pac. 856].)

It follows that the inquiry which we may make under the writ issued in this case is limited to determining whether or not the railroad commission has exceeded its jurisdiction in making the order complained of.    If section 67 of the act undertakes to give to this court any broader power than that, the attempt so to do must be disregarded as in violation of the constitution.    I think, however, that, properly construed, section 67 does not assume to authorize anything more than a search into the jurisdiction.    It provides that the review shall not be extended further than to determine "whether the

commission has regularly pursued its authority." This is
the very language of section 1074, and is synonymous with
determining whether the commission has acted within its
jurisdiction. The words "including a determination of
whether the order or decision under review violates any right
of the petitioner under the constitution of the United States
or of the state of California" do not extend the inquiry as
thus defined. The examination of constitutional rights is,
under the terms of the Public Utilities Act, *included* in the
inquiry whether the commission has regularly pursued its
authority. It is not made a separate and distinct subject of
judicial scrutiny. Whether or not the commission is acting
within its jurisdiction may or may not depend upon con-
stitutional questions. I do not understand, as seems to be
held in Justice Henshaw's opinion, that *Spring Valley Water
Co.* v. *Bryant,* 52 Cal. 138, decides that the question whether
the petitioner's constitutional rights have been invaded can
never be inquired into on *certiorari.* The declaration quoted
from the opinion in that case was made and is to be read in
connection with the determination of the court that the order
sought to be reviewed was not a judicial order. This being
so, it was not a proper subject of a writ of *certiorari,* whether
or not constitutional rights were claimed to be invaded. If
the constitutional question raised is one that goes to the juris-
diction of the lower tribunal, I do not see why it, as well as
any other jurisdictional question, cannot be considered and
decided under such a writ. If, for example, the legislature
should undertake to give to the justice's court original juris-.
diction of an action in equity, I do not doubt that a judgment
rendered by such court in an action of that character could
be reviewed and annulled upon *certiorari,* upon the ground
that the legislative attempt to confer jurisdiction was in vio-
lation of the constitution. Be this as it may, the inquiry in
this case cannot extend further than to determine whether or
not the railroad commission has acted within its jurisdiction
in making the order complained of. I do not go specifically
into the question whether the order complained of is judicial
in character and therefore subject to review, as I think that
question is virtually determined in favor of the petitioner by
the decision in *Imperial Water Co.* v. *Board of Supervisors,*
162 Cal. 14, [120 Pac. 780].

What, then, are the grounds of objection to the order here made? It is said that the order is, in effect, one for the taking of private property for public use without compensation, and that such order therefore violates the provisions of both the state and federal constitutions.

I do not see how it can be said that there is any violation of the state constitution. The procedure of the railroad commission and the order made by it were in strict conformity with section 40 of the act. That section gives the commission power to do just what it has done. If this amounts to a taking of private property for public use without compensation, it is a taking authorized by the terms of the act. Under the provisions of sections 22 and 23 of article XII of the constitution above quoted, the powers granted to the commission by the act are not controlled by any provisions of the state constitution. Hence it cannot be said that an order made under a power expressly conferred by statute upon the commission violates that constitution. Section 40 names the conditions on which the order can be made, viz., that it can reasonably be made, that the lines can be made to form a continuous line of communication, that public convenience and necessity will be subserved thereby, and that the purpose is not primarily to secure local transmission. Finding these conditions, the commission is authorized to order the connection under rules and regulations established by it and, if the companies do not agree, to fix the division of the cost of connection and of the rates. Evidently no compensation except such as may inhere in a division of tolls is contemplated. It is, then, the law, and not any order made outside of the law, that takes property without compensation, if property is thus taken. I do not find in the act any provision authorizing the railroad commission to exercise generally the power of eminent domain or to assess damages on condemnation. The only section authorizing it to allow a compensation for property taken is section 41, which refers solely to the case of one public utility using the conduits, subways, tracks, wires, etc., of another *on, over or under a street or highway.* This section has no pertinency to the case at bar. There is no provision which requires or authorizes the railroad commission in a case like the one before us to award to one of the two telephone companies directed to make a physical

connection between their lines, any compensation as such for the taking of its property. The commission, therefore, has strictly pursued the powers which the legislature, acting under the plenary power conferred upon it by the state constitution, has granted, and the provisions of other parts of that constitution seem to me to be out of the case.

The other ground of attack is that the order is a violation of the rights of the petitioner under the federal constitution. The fifth amendment to the constitution of the United States, providing that private' property shall not be taken for public use without just compensation, has no bearing upon the case, as it is well settled that this amendment is a limitation upon the power of the federal government and not upon that of the states. (*Barron* v. *Baltimore,* 7 Pet. 243, [8 L. Ed. 672].) If, however, the order in question does amount to a taking of private property for public use without just compensation, such taking is a violation of the rights of the petitioner under the fourteenth amendment to the constitution of the United States, providing that no state shall deprive any person of life, liberty, or property without due process of law. "A law which authorizes the taking of private property without compensation or for other than a public purpose cannot be considered as due process of law in a free government." (1 Lewis on Eminent Domain, 3d ed., sec. 11.) And this doctrine is fully elaborated and clearly laid down in *Chicago etc. R. R. Co.* v. *Chicago,* 166 U. S. 226, [41 L. Ed. 979, 17 Sup. Ct. Rep. 581. (See, also, *Ex parte Martin,* 13 Ark. 198, [58 Am. Dec. 321] ; *Harness* v. *Chesapeake etc. Canal Co.,* 1 Md. Ch. 248; *Staton* v. *Norfolk etc. R. Co.,* 111 N. C. 278, [17 L. R. A. 838, 16 S. E. 181].)

Upon the remaining question—whether the order of the commission amounts to a taking of the property of the petitioner without compensation—I agree with the conclusion reached in Justice Henshaw's opinion, and, in substance, with the reasoning upon which that conclusion is based. It is plain that the answer to this question depends upon an ascertainment of the precise nature of the governmental power which has been called into use in making the order before us. If the commission has merely exercised the power of regulation conferred upon it—if, in other words, it has, as an instrument of the state, used the police power of the state—

no right under the federal constitution is invaded, unless the order is so arbitrary and unreasonable as to amount to a confiscation of property. The order, viewed as a pure regulation, can hardly be so characterized. Even if it could, it is doubtful whether, in view of the provision of the Public Utilities Act that the findings and conclusions of the commission on questions of fact, including reasonableness and discrimination, shall be final and not subject to review, the order could be attacked on this ground in any court of this state, however assailable it might be in the federal courts. If, on the other hand, the commission, pursuing the power attempted to be granted to it, has made an order which amounts to a taking of the petitioner's property for public use, the commission, as an agency of the state, was exercising the power of eminent domain. If that power was sought to be exercised without at the same time making provision for compensating the petitioner for the property taken, the order was one which the state was, by virtue of the fourteenth amendment to the federal constitution, precluded from making. It may be that, if the statute contained proper provision for an assessment and payment of compensation for the taking, the failure of the commission to fix and allow adequate compensation could not be made the basis for assailing the order on *certiorari*. In such event, it might be said that the statute vested jurisdiction in the board, and that an order which omitted to provide compensation would merely constitute error in the exercise of jurisdiction. (See *Bishop* v. *Superior Court*, 87 Cal. 226, [25 Pac. 435].)

But, as already stated, the statute itself fails to provide for the assessment or payment of damages, and such statute must, therefore, be held to be in conflict with the federal constitution to the extent that it assumes to authorize the taking of private property without compensation. A void statute— and one which conflicts with either the federal or the state constitution is void—is not effective to confer jurisdiction on any court or board whose authority to act in the particular case is not granted except by that statute. This is well illustrated by the case of *Connecticut River R. R. Co.* v. *County Commissioners*, 127 Mass. 50, [34 Am. Rep. 338], where it was held that a writ of probihition would lie to prevent proceedings in eminent domain under a statute which did not

make adequate provision for compensation to the party whose
property was sought to be taken.

I think it cannot be doubted that an order, compelling the
owner of private property, against his will, to subject that
property to the use of the public or of an individual, amounts
to a taking of property. For property consists, not of the
tangible things, whether realty or chattels, over which do-
minion is claimed, but of the right to possess or use those
things. An order requiring the owner of a house to permit
others to occupy and use it, is a taking of that house, al-
though the legal title remains in the owner. So an order
compelling the owner of a telephone line, or of any other
property adapted only to a particular use, to surrender it, in
a greater or less degree, to such use by others, is clearly a
taking of that property. Where the particular property has
been dedicated to a public use; where the property, in other
words, is employed in a public service, the owner has con-
sented that the public may use his property within the limits
to which the dedication extends. Within those limits, the use
by the public does not constitute a taking, or, if it be a tak-
ing, it is one which has been invited by the owner. But the
fact that property has been offered for one public use does
not authorize the public to use it for other and different pur-
poses. The purveyor of a public service—whether that of a
carrier or an innkeeper, a light or power company, a tele-
phone or a telegraph company, is not bound to undertake a
service different from that which he has professed to render
(Wyman on Public Service Corporations, sec. 251.) Thus, a
railroad which has undertaken to carry passengers only could
not be compelled to accept freight offered for shipment, and
it can hardly be doubted that a law directing it to undertake
the new service would amount to a taking, *pro tanto,* of its
property, for which compensation would have to be made.
On like reasoning, an order compelling a telephone company
to subject its lines and appliances to the burden of a service
substantially different from that which it has offered to per-
form, is a taking of its property. It seems clear to me that
the physical connection ordered in this case does compel the
petitioner to allow a use of its lines beyond the use which it
professes to extend to the public. It is more than a regula-
tion of a public service undertaking; it is a direction to per-

form a kind of service which has not been undertaken. The petitioner has established lines of long distance communication, and has connected them with local exchanges, so that its customers served by the various local exchanges may have the benefit of the long distance lines. The long distance advantages are also at the service of those who apply for them at pay stations of the company. No doubt the petitioner could not arbitrarily exclude any member of the classes to which its service had thus been offered. Any one desiring a telephone installed within a district to which local service has been offered, or one applying at a pay station for a long distance connection, would be entitled to the service demanded. But these are very different things from compelling a physical connection with the lines of a company competing with the petitioner in a local field, to the end that the competing company's patrons may have the benefit of long distance service from their homes. Of course, if the Pacific States Company had dedicated its long distance plant to this use—if it had held itself out as prepared to make and had made connections with such rival companies, it would be bound to treat all alike. An order requiring a connection would in such case be a mere regulation of the service within the scope of the professed service. But such is not the case here. It is true that the findings of the commission refer to the fact that the petitioner had, under agreement, connected with other companies. Mention of this circumstance was made in answer to the claim that there were practical difficulties in the way of making a physical connection. It is not claimed, however, and under the evidence there was no room to claim, that the petitioner had ever made connections with competing companies. All it had done was, upon terms and for a consideration (or compensation) satisfactory to it, to connect with companies operating in territories where it offered no local service. The fact that the service here is directed to be given to competing companies seems to me to be a most essential factor in the conclusion that the petitioner is called upon to subject its property to an additional and different use. Rival companies are not within the class of the public to which it has offered its facilities for use. (Wyman on Public Service Corporations, sec. 698.) If there were two companies furnishing electric light or power to the inhabitants of a city,

could one of such companies, having a surplus of current beyond that required for its existing contracts, be compelled to furnish that surplus to the rival company, for no other compensation than a rate fixed by public authorities, to the end that the rival might be enabled to compete with it more effectively? It would seem fairly clear that this was not a service which the first company had undertaken or professed to perform. The case at bar is, I think, the same in principle. By installing its long distance plant for the use of subscribers to its local systems, the petitioner has developed an element of great value in the conduct of its local business at various points. It has thereby built up for itself an advantage, and a perfectly legitimate one, over competitors who, with a much smaller investment and at far smaller risk, have created only a local system. It has never offered to share this advantage with rival companies. To be compelled to so share it is to subject its property to a new use—and thus, in part, to take it. If the public interest requires the connection, appropriate provision for estimating and paying the damage occasioned thereby must be made. A mere division of the tolls, even though the entire toll may be allotted to the petitioner, is not the compensation required as a condition to the taking of property for public use. In the first place, it is uncertain, both as to amount and time. (*Connecticut River R. R. Co.* v. *County Commrs.*, 127 Mass. 50, [34 Am. Rep. 338].) In the next place, the division of tolls will only pay the company for the service actually rendered by it from time to time. It will not afford any compensation for the damage occasioned by the taking, i. e., by the subjecting of its property to the demands of a public service to which that property was not dedicated. What the measure of such damage is I do not attempt here to define, but it is plain that it includes elements not covered by a mere apportionment of tolls.

The conclusions reached may be summarized as follows:

1. This court has no power to review the orders of the railroad commission except by means of a writ of *certiorari*, or to control its action except in appropriate cases by *mandamus*. No other court of the state has any power to review the orders of the commission or to control its official action.

2. Upon a writ of *certiorari* against the railroad commission this court must inquire whether the railroad commission has acted within its jurisdiction, and if this inquiry be answered affirmatively the proceeding must be dismissed.

3. If the railroad commission has acted in conformity with the powers granted to it by the legislature, the validity of its order cannot be questioned in this court or elsewhere under a claim of violation of any provision of the state constitution other than the provisions relating to the railroad commission. This statement is, however, to be taken subject to the qualification that the powers conferred by the legislature on the railroad commission must be such as are cognate and germane to the purposes for which the railroad commission was created, i. e., the regulation and control of public utilities.

4. Where the commission has acted within the powers conferred upon it by the legislature, the only recourse of one affected by its action is to the guaranties of the federal constitution. And in cases where the violation of the right guaranteed by the federal constitution does not involve an excess of the jurisdiction of the railroad commission, the federal courts are the only ones in which he may assert his rights under those guaranties.

5. If the railroad commission, acting within the powers granted to it by the legislature, makes an order which amounts to a taking of private property for public use without compensation, such order does not violate any provision of the constitution of this state.

6. If in making such order private property is taken for public use without compensation, such taking is a violation of the provisions of the fourteenth amendment to the constitution of the United States.

7. Any provision of the Public Utilities Act is void to the extent that it purports to grant to the railroad commission power to take private property without compensation, and the act confers no jurisdiction on the board to make an order having this effect.

8. Section 40 of the act, authorizing the ordering of physical connections between telephone companies is void in so far, at least, as it purports to require a company having long distance and local service, to make a physical connection for long distance service with a company competing locally, where

the first company has not professed to render this kind of service.   An order for physical connection is, in such a case, a taking of the property of the complaining company without compensation.

9. The order under review was in excess of the jurisdiction of the commission and should be annulled.

Shaw, J., concurred.

ANGELLOTTI, J., dissenting.—I am unable to concur in the judgment annulling the order of the railroad commission, and in view of the importance of the case deem it proper to state very briefly my conclusions upon what I consider the material questions presented.

I concur in the conclusions reached by Mr. Justice Sloss in his concurring opinion, numbered in the summary at the end thereof as 1, 2, 3, 4, and 5, and in the reasoning upon which the same are based.   Nor can there be any doubt that the conclusion in said summary numbered "6" is correct.   It is not so clear to me, however, that, even if we assume that under the facts of this case, the execution of the order in question involves a prohibited taking of private property without compensation, any *excess of jurisdiction* on the part of the railroad commission is shown, or anything other than such a violation of a right guaranteed by the federal constitution, as, in view of the provisions of our state constitution and those of the Public Utilities Act, can be alleged and determined only in the federal courts.

However this may be, I am not convinced that there is shown by the facts of this case any "taking" of petitioner's property within the meaning of that term as used in our law prohibiting the taking of property without compensation to the owner.   Not being satisfied of the correctness of the conclusion that such a taking is shown, I am unable to concur in the judgment.

It is clear enough to me that the legislature in enacting section 40 of the Public Utilities Act considered that it was simply providing for the regulation, under the police power of the state, of the use of property by the owner thereof for the purposes to which it had been dedicated for public use, and that it was not at all providing for the taking of private

property for a public use, or the taking of property already subjected to a certain public use for a different public use. The absence of any provision at all for the ascertainment of the compensation to be made for the taking of any property, and the limiting of such matter to compensation for the *service* to be rendered, when considered in connection with the language of the section, would appear to sufficiently indicate this.    Clearly section 40 does in terms effectually authorize anything specified therein that amounts to no more than a reasonable regulation, under the police power of the state, of the use of property by the owner thereof for the purposes to which it has been dedicated.

While the question presented is one not entirely free from doubt in my mind, it seems to me that the situation presented by the facts of this case is analogous to that presented where two railroad companies are required to connect their tracks, and each company is required to receive at the point of connection for transportation over its route cars delivered to it for such transportation at such point, proper compensation for such service of transportation being made to it.    The validity of orders requiring this, where authorized by constitutional or statutory provisions of a state, appears to have been declared by decisions of the United States supreme court, on the theory that there is no prohibited taking of property, and that the order is a lawful exercise of the police power of regulation, demanded by the public interest.    The carrying company in such a case is simply engaged in using its line of railroad *for the purposes to which it has dedicated it,* the carrying of passengers and freight presented for transportation at a point on its route, receiving proper compensation for its *service,* and the fact that it is compelled to do this with cars delivered to it by another company involves no prohibited taking of any part of its property.    Such appears to me to be the theory of the decisions of the ultimate tribunal upon this point, the United States supreme court.    Such a case is very different from one where it is sought to compel one railroad to admit another to the use of its tracks by trains operated by and under the control of the employees of the other road, involving as it does, a physical occupation and control of the property of the road by the other road for its own purposes. It is urged that such is the situation here.    To me this con-

clusion appears to be based upon an entirely immaterial factor which is necessarily incidental to the use of the telephone, viz.: that the exclusive use of a wire of the petitioner is essential to the carrying on of a conversation between a subscriber of one of the independent companies and the person on petitioner's system with whom the conversation is being had. This, as I understand it is claimed, would render the order one constituting a taking of petitioner's property by the independent company for the period of the conversation. But this is the same kind of a taking that any member of the public conducting a conversation from a public exchange of petitioner in Willows or Red Bluff, with a person anywhere on petitioner's system, would enjoy. It is simply an essential part of the *service* for the rendition of which, for a proper compensation, the property of petitioner is dedicated, and as long as proper compensation for the *service* is made, there is no prohibited taking. It cannot be claimed that petitioner could lawfully refuse to allow any of the subscribers of the independent companies who present themselves, personally or by agent, at their public exchange in Willows or Red Bluff, to use its system upon paying the toll prescribed for the service demanded. Except in so far as the mere matter of convenience is concerned, is there anything more involved here, material on the question of a ''taking'' of petitioner's property? The independent companies may well be said to be simply the agents of their subscribers for the purpose of procuring at the exchanges of petitioner, Willows and Red Bluff respectively, the long distance service offered to the public generally at those points by petitioner. They propose to so physically connect their systems with that of petitioner at the points named, at their own expense, that their subscribers may at those points, upon payment by such companies to petitioner of the prescribed rate therefor, obtain the service offered to the public generally. The petitioner's system remains under the exclusive control of petitioner through its own employees. They alone, so far as any service over petitioner's system is concerned, furnish the service. Without their co-operation, not an inch of petitioner's system may be used for such service by the independent companies or by any subscriber thereof, and such use is at all times under their exclusive control. The service

is to be furnished in precisely the same way that it is furnished to any other person obtaining such service, the subscribers of the independent companies having no preferential right over any other person in the matter of such service. There is no question properly presented in this proceeding as to inadequacy of the rate to be paid for the service.

I do not dispute the proposition made in the opinion of Mr. Justice Sloss to the effect that if the physical connection ordered in this case compels petitioner to allow a use of its lines for other purposes than those for which it may fairly be held to have been dedicated, which is held to be the fact in the prevailing opinions, a very different situation would be presented. My difficulty is in seeing that such will be the effect of the physical connection ordered. It seems to me that the dedication of the property of petitioner includes the use here ordered, which is, as I look at it, simply the use by itself of its own system for the transmission of long distance telephone messages of the public, for a compensation, the order of the commission confining the use under the physical connection solely to long distance messages. And I cannot see that the fact that each of the independent companies is a rival of petitioner in the matter of local business in the particular locality served by it, is at all material upon the question whether there is a "taking" of petitioner's property in the prohibited sense. That fact might be material in determining whether, under the circumstances of this case, the regulatory order of the commission was reasonable and without discrimination, a question which the state courts appear to be precluded from considering in view of certain provisions of the Public Utilities Act, and as to which petitioner's only recourse is the federal courts.

The question of a prohibited taking, which I have briefly discussed, is, as I have said, one not entirely free from doubt. My own opinion, in the light afforded by the decisions of the United States supreme court, is that there is here no such taking of petitioner's property. I deem it unfortunate that a decision of this court holding to the contrary precludes a consideration of the question by the United States supreme court, the final authority on such questions. This result, however, is due solely to what I consider a serious defect in the law, and in no degree to this court, the members of which

are bound to decide the question in accord with their conclusions thereon, regardless of whether or not there is a power of review lodged anywhere. But that a decision of this court to the effect that a person's rights under the federal constitution are not violated by the enforcement of a state statute may be reviewed by the United States supreme court at the instance of the party complaining, and that one to the effect that such rights are violated may not be so reviewed at the instance of the state, with the result that the decision of the state court is final and conclusive against the state on a purely federal question, appears to me to present a situation that is not only most unfortunate, but also one for which there is no warrant. Yet such appears to be the law as it now stands.